345 So.2d 922 (1977)
Howard A. KIDDER
v.
Bob ANDERSON and Capital City Press, Inc.
No. 11205.
Court of Appeal of Louisiana, First Circuit.
March 21, 1977.
Rehearing Denied May 9, 1977.
Writ Granted June 17, 1977.
*924 Robert L. Kleinpeter, Baton Rouge, of counsel for plaintiff-appellee Howard A. Kidder.
Frank W. Middleton, Jr., Frank M. Coates, Jr., W. Arthur Abercrombie, Jr., Baton Rouge, of counsel for defendants-appellants.
Before SARTAIN, COVINGTON and LOTTINGER, JJ.
COVINGTON, Judge.
This is a defamation action by Howard A. Kidder, Acting Chief of Police, against Bob Anderson, newspaper reporter, and Capital City Press, Inc., the owner and publisher of the Morning Advocate and State Times newspapers and the employer of Bob Anderson, for damages in the amount of five and one-half million dollars, arising out of several newspaper articles and editorials appearing in the newspapers, in one or the other or both, from June 12, 1974, through August 8, 1974. The plaintiff alleged that the "offending statements" published by the defendants were calculated to degrade him and to hold him up to public ridicule in that they depicted him, a law enforcement officer, as operating a house of prostitution, as engaging in illicit dealings with barroom proprietors and gamblers, and as using the influence of his office for personal gain.
The defendants denied that the "offending statements" were defamatory. They *925 also expressly pleaded constitutional rights under the First Amendment of the United States Constitution, and truth, as defenses.
During the course of the proceedings, the defendants moved for partial summary judgments, primarily based on the failure of the plaintiff to show sufficient evidence of "actual malice" to let the case go to the jury.
The motions for partial summary judgment were denied by the lower court. Then, applications for supervisory writs were made to the Court of Appeal and the Supreme Court for review of the summary judgment denials. Both appellate courts declined the applications for writs, finding no error in the lower court's finding of genuine issues of material facts in dispute.
The case then proceeded to trial by jury. After an eight-day trial, the jury returned a verdict in favor of the plaintiff, awarding damages in the amount of $400,000.00. From the judgment implementing the jury's verdict, the defendants have suspensively appealed.

SPECIFICATION OF ERROR NO. 1
The trial court properly denied both motions for partial summary judgment. It is only when there is no genuine issue as to a material fact that the mover is entitled to summary judgment. LSA-C. C.P. art. 966. In ruling on such a motion, it is not the function of the lower court to determine the merits of the issues raised; its function is to determine whether or not there is a genuine issue of material fact. Metoyer v. Aetna Insurance Company, 278 So.2d 847 (La.App. 3 Cir. 1973).
In Batson v. Time, Inc., 298 So.2d 100 (La.App. 1 Cir. 1974), writ den., La., 299 So.2d 803, we had occasion to consider a motion for summary judgment; and, in sustaining the lower court's rejection of a motion for summary judgment, we acknowledged "the chilling effects of a lengthy and costly trial" on First Amendment rights, and then remarked:
"Equally pertinent, however, is the well established rule that in cases of this nature, the courts are most careful to protect plaintiff's right to jury trial, when disposing of a motion for summary judgment pursuant to F.R.Civ.P. Rule 56. In applying Rule 56, the courts note the Rule's provision that, on trial of a motion for summary judgment, plaintiff may not rely upon his pleadings, but must, by affidavit or otherwise, set forth facts and allegations which establish the existence of a genuine issue of material fact. Also in applying Rule 56, the courts grant summary judgment where the pleadings, depositions, answers to interrogatories, affidavits and admissions disclose the absence of a genuine issue of material fact. "More importantly, the Federal cases have repeatedly held that in a defamation action, as in other actions, the adverse party against whom summary judgment is requested is entitled to have all the evidence, depositions, affidavits and inferences reasonably drawn from them, viewed in the light most favorable to him in determining whether he has shown the existence of a genuine issue of material fact."
The guidelines for the use of the summary judgment procedure as authorized by LSA-C.C.P. art. 966 are well established. They are succinctly stated in the case of Roy & Roy v. Riddle, 187 So.2d 492 (La.App. 3 Cir. 1966), writ ref., 249 La. 724, 190 So.2d 236, as follows:
"The courts have noted repeatedly that the summary judgment remedy is not a substitute for a trial and may not be resorted to when there is a genuine issue of material fact which must be resolved. In passing upon a motion for summary judgment, the function of the court is not to determine the merits of the issues raised, but rather only to determine whether or not there is a genuine issue of material fact. To obtain a summary judgment it is not sufficient to prove that it is unlikely that the plaintiff may recover, nor that the showing then made preponderantly indicates there is no liability. The burden of showing that there is not a material factual issue is upon the mover for summary judgment. All doubts are to be resolved against the granting of a *926 summary judgment and in favor of a trial on the merits to resolve disputed facts."
Turning to the federal jurisprudence for guidance, we find the Court of Appeals, Ninth Circuit, in Guam Federation of Teachers, Local 1581, A. F. T. v. Ysrael, 492 F.2d 438 (C.A. 9 1974), stated:
"However, with respect, we are not persuaded by the second phase of Judge Wright's analysis in Wasserman which suggests that in deciding these motions, the trial court should judge the credibility of witnesses and draw its own inferences from the evidence. We think that in a libel case, as in other cases, the party against whom a motion for summary judgment, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or of this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, where no contrary inference can legitimately be drawn), but that neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases.
"The standard against which the evidence must be examined is that of New York Times and its progeny. But the manner in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the New York Times standard, the case is one for the jury, and it is error to grant a directed verdict, as the trial judge did in this case."
We also find the language of Whitaker v. Coleman, 115 F.2d 305 (C.A. 5 1940), particularly applicable to a case of this nature:
"Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right to trial by jury if they really have evidence which they will offer on a trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists."
We think too that 10 Wright and Miller, Federal Practice and Procedure, Civil section 2712, pp. 387-389, Rule 56, places the summary judgment in proper perspective:
"Since its impact is rather drastic, summary judgment must be used with a due regard for its purposes and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. As stated by the Tenth Circuit in Avrick v. Rockmont Envelope Company (155 F.2d 568, 571, C.A. 10 1946): `The power to pierce the flimsy and transparent factual veil should be temperately and cautiously used lest abuse reap nullification.'"
With the foregoing law in mind, we have reviewed the pleadings, exhibits, affidavits and other evidence available for consideration by the court on the motions for summary judgment. The affidavits filed by movers do not measure up to the standard set out by LSA-C.C.P. art. 967. They fail to affirmatively show that the facts set forth in the affidavits were matters within the personal knowledge of the affiants. We said in Benoit v. Burger Chef Systems of Lafayette, Inc., 257 So.2d 439 (La.App. 1 Cir. 1972):
"Therefore, when mover relies on the personal knowledge of an affiant to establish the nonexistence of a genuine issue of fact and fails to assert facts which would affirmatively show the affiant's competency to testify to such facts, his proof of the same fails by reason of the insufficiency of the affidavit. LSA-C. C.P. Art. 967."
We find that the proof of the mover fails to establish the nonexistence of genuine issues of fact in the instant case.
We agree with the trial judge that there were genuine issues of material facts, *927 even if we accepted movers' affidavits, and that it was proper for the case to go to trial by jury. The plaintiff's evidence was sufficient to meet the New York Times standard. We interpret the Guam case as completely refuting the view of Judge Wright in Wasserman v. Time, Inc., 138 U.S.App. D.C. 7, 424 F.2d 920 (1970), followed in Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858 (5 Cir. 1970). There is no acceptance by the Federal courts that the court must weigh or re-weigh the evidence or determine the credibility of the witnesses, and that the proof must be with "convincing clarity". The function of both the federal and state courts is to determine whether or not the plaintiff has presented a genuine issue of material fact from which a jury could find that the publisher published the article with actual knowledge of its falsity or with a reckless disregard as to whether it was false, i. e., with "actual malice". In the pre-trial stage, the plaintiff certainly is not required to prove "actual malice with convincing clarity" (as he must do in order to prevail on trial per the New York Times standard), because that would require a weighing of the proof, which Guam says is not to be done by the trial judge. Rather, at that stage of the proceeding, the plaintiff need only present evidence which shows that there is a genuine issue of material fact from which a jury could find actual malice.
Where the crucial fact in a case is a predominantly subjective one, such as "actual malice" in the instant case, it would seem to us to be placing an unconstitutional burden on a plaintiff to require him to file an "affidavit" based on "personal knowledge" that the publisher of an alleged defamatory statement did so with "actual malice", and to prove this predominantly subjective factor by clear and convincing evidence, submitted in a pre-trial procedure, under penalty of forfeiture of his right to trial by jury in the absence thereof.[1] We believe that it is better that an occasional publisher get slightly frostbitten than that the cold-shoulder of injustice be eternally turned toward the defamed public official, if it can be truly said that any trial has a "chilling effect" on the news media. We believe that the practitioners of the journalistic art are hardier souls than some of our esteemed brethren believe. We believe that it would take more than a threat of a libel action to still the voice of a newspaper or to blunt the pen of a newswriter, or to dull the wit of either. We do not presume that the John Peter Zengers have all faded into the obscure pages of history.
We believe that if the First Amendment were repealed tomorrow, the newspeople of this nation would not skip a heartbeat or a deadline; they would continue to fearlessly bring to their readers and listeners all the news that's fit to print and hear. To hold a newsperson accountable for his transgressions is not to censor him, it is merely to make him mindful of the awesome responsibility he has to the public. Accountability is not a clarion call of "stop the press"; it is but a whisper for respect for the people who make the news. After all, it is not the first amendment that makes a newspaper great; it is the front page.
We believe the trial court could only find on the basis of the pleadings, exhibits, affidavits and other available evidence that the plaintiff would have been able to prove "actual malice" by clear and convincing evidence, and we agree with the trial court that he should have been given the opportunity to do so.

SPECIFICATION OF ERROR NO. 2
This assignment of error is the crux of the case. The appellants contend that the *928 jury erred as a matter of law in finding liability on the part of the defendants. The basis for this contention is that the jury did not properly apply the New York Times standard in reaching its verdict.
We have reviewed the evidence, first, as a reviewing court, to see if the jury committed manifest error in reaching its verdict; and secondly, as a reconsidering court directed by Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), to examine the evidence as a trier of fact, in order to render a judgment based on the record. Our careful review of the record convinces us that the jury's verdict as to liability is supported by ample and sufficient evidence, and the jury did not commit manifest error in its verdict; and we are persuaded that the liability of defendants has been proven by "clear and convincing evidence" within the New York Times standard.
We are, of course, mindful that "in order for there to be a free and vigorous press it must have `breathing space' between the First Amendment on the one hand, and libel actions, on the other hand." See Carey v. Hume, 390 F.Supp. 1026 (U.S. D.C., D.C., 1975). Thus, under the New York Times standard, a "public person" must show that the defamatory falsehood was published with "actual malice," in order to recover damages. See Note, 39 Tul. L.Rev. at page 360 (1965).
It is succinctly stated in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that:
"The New York Times standard defines the level of constitutional protection appropriate to the context of defamation of a public person."
Since the plaintiff is admittedly a "public official," the New York Times standard is clearly applicable to determine the defamatory nature of the publications which give rise to the instant action for defamation.
The applicable standard was first enunciated by the United States Supreme Court in the case whose name it carries, New York times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as follows:
"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 84 S.Ct. at 726.
In Carson v. Allied News Company, 529 F.2d 206 (C.A. 7 1976), the court commented:
"`Actual malice' has become a term of art to provide a convenient shorthand for the New York Times standard of liability. It is quite different from the common law standard of `malice' generally required under state tort law to support an award of punitive damages. Whereas the common law standard focuses on the defendant's attitude toward the plaintiff, `actual malice' concentrates on the defendant's attitude toward the truth or falsity of the material published."
Although the New York Times case does not exactly define "actual malice," it does provide criteria for its ascertainment, either knowledge of the falsity, or reckless disregard for the truth will meet the test of "actual malice."
In Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the United States Supreme Court "refined its standard," stating that "only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions." See Washington Post Company v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966).
In Garrison the Court emphasized:
"The test which we laid down in New York Times, is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth." 85 S.Ct. at 218.
*929 The Court, in St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), explained:
"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."
In Carson, supra, 529 F.2d at 209, the court explained:
"Examples of reckless disregard expressly given by the Supreme Court include where a story is fabricated by the defendant, is the product of his imagination, is based wholly upon an unverified anonymous telephone call, or where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."
Not only must the plaintiff in a defamation case meet the standard of "actual malice," he must bear the burden of proving with convincing clarity that the statements were false and that the false statements about him were made with "actual malice"; "actual malice" is never presumed. St. Amant v. Thompson, supra.
Moreover, in St. Amant the court said that it is "clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for the truth or falsity and demonstrates actual malice." Thus, the federal rule which the plaintiff must comply with to prevail in the instant case can be stated: the plaintiff must prove with clear and convincing evidence that these particular defendants, with knowledge of falsity or a reckless disregard as to whether the publication was true or false, have defamed him by publishing a falsehood about him.
The test is stringent and the burden heavy on a public person in a defamation action. Hence, in light of the standard and the evidential burden on the plaintiff, to decide whether the press published the "offending statements" with "willful knowledge" or "reckless disregard" of their falsity is not an easy task for the trier of fact.
The central issue in this case is, thus, whether the facts bring it within the rule of the New York Times case, as to "constitutional malice" and "proof of convincing clarity."
It is primarily the defendants' contention that under the federal standard there was no basis for liability against them, and that the jury erred in finding them liable. The defendants' position is that, under New York Times Company v. Sullivan, supra, they are not liable for the "offending statements" made about Kidder even if they were false, because plaintiff failed to prove with convincing clarity "actual malice" on the part of the defendants. We find their position untenable.
The evidence fully substantiates that the defendants acted in reckless disregard of the falsity or truth of the statements which they published about Acting Chief Kidder. This is not a case of a failure to investigate by the defendants. See St. Amant v. Thompson, supra. The investigation they conducted showed clearly that the accusations which they intended to publish, and did publish, about Kidder were false. The "calculated falsehood," according to Garrison, puts "a different cast" on the *930 question. For example, prior to publishing the accusation that Kidder, while a member of the Baton Rouge police force, operated a house of prostitution, the defendants had positive information that there was no truth in the rumor that Kidder was once involved in prostitution. It appears from clear and convincing evidence that Anderson, the reporter, joined with Childers and Spillers, two disgruntled police officers, in a deliberate effort to prevent the appointment of Acting Chief Kidder to the position of Chief of Police. Anderson's own testimony reveals that his interest in getting rid of Kidder was not that of an objective reporter in bringing "the news" to the reading public.
Bob Anderson testified as follows, regarding undercover investigations unrelated to Kidder:
"Q. And you knew that they (Childers and Spillers) gave you information that they refused to give to the Chief of Police, didn't you?
A. Yes, sir, the Acting Chief of Police.
Q. And with this knowledge, knowing that they were more loyal to you as a newspaper reporter or investigative reporter than they were to their employer, you accepted their assistance and continued these investigations.
A. Yes, sir."
The facts show that in May, 1974 the defendant's newspaper had high praise for Kidder and congratulated the Mayor for making such a good choice for the command of the Baton Rouge Police Department. In an editorial, in the States Times on May 2, 1974, the following comments were made:
"CHANGE IN COMMAND
"Lt. Col. Howard Kidder, as acting Chief, now has immediate command of the Baton Rouge Police Department. The designation of him by Mayor-President Dumas is related to the current hospitalization absence of Chief Rudolph Ratcliff and the latter's publicly proclaimed intention to leave the city department in a few weeks to become a candidate for Sheriff in Livingston Parish, his homeground. "Col. Kidder is an intelligent man, whose police career runs the gamut from beat patrolman to the acting Chiefship he now occupies. Presumably the `acting' will be dropped with the formal departure of Chief Ratcliff. Col. Kidder has long demonstrated exceptional ability as an administrator, without having lost touch with the very human problems of the officer on patrol in night's lonely hours.
"On the record he already has behind him, acting Chief Kidder will maintain an `open door' office to department, press and to the public at large. What he says, he means; what he means, he says.
"The mayor-president had some multiple choices in meeting the police department contingency at hand. Without derogation to any of the others, the choice made was a good one."
Then, a complete about-face was taken by the press. There followed a series of newspaper stories attacking Acting Chief Kidder, which form the basis of this lawsuit: ten newspaper articles or pictures and one editorial, copies of which were offered in evidence by the plaintiff. These articles, and the balance of the evidence in the case, can be grouped into five subjects for analysis and discussion. (Several subjects or stories were covered by similar articles in both the morning and afternoon newspapers). The five subjects, and the articles pertaining to each, are:

1. Barroom Protection:

"Statements Say Police Officials Protected Gambling, Barrooms", an article appearing in the Sunday Advocate on July 14, 1974.

2. Assessments on Mr. Kidder's Property:

"Kidder-Owned Duplex", a picture and caption appearing in the State Times on July 17, 1974.
"Kidder Rental Houses Got Cut in Assessment", article appearing in the State Times on July 17, 1974.
*931 "Policeman's Property", a picture and caption appearing in the Morning Advocate on July 18, 1974.

3. Harassment of a Police Officer:

"Harassment Is Claimed By Officer", article appearing in the Morning Advocate on July 17, 1974.
"Officer Says Job Change Harassment", an article appearing in the State Times on July 17, 1974.

4. Involvement In A House of Prostitution:

"Kidder Reported Once Involved in Prostitution", an article appearing in the Morning Advocate on August 8, 1974.
"Kidder Reportedly Was Bawdy House Operator" an article appearing in the State Times on August 8, 1974.

5. Police Uniforms:

"Baton Rouge Police Uniforms Criticized", an article appearing in the Morning Advocate on June 12, 1974.

1. Barroom Protection:

This is a lengthy article written by Anderson which appeared in the Sunday Advocate, on July 14, 1974. The first four paragraphs of this story contain a general summary of the information and reports contained in the remainder of the story. These first four paragraphs read as follows:
(1) "Acting Police Chief Howard Kidder and several other high police officials have a history of protecting some barrooms and gambling operations, according to statements from police officers and other informed sources.
(2) "Allegations of payoffs and gratuities are also contained in the statements.
(3) "Among the statements are notarized affidavits from two barroom employees who say they have witnessed Kidder receiving free liquor and signed statements from a number of police officers who say they have been stopped from making cases against certain barrooms.
(4) "Statements from other officers recount being told by gambling and barroom figures of payoffs and gifts they have given Kidder and other officers."
Paragraphs five and six relate that various statements have been given to state and federal investigatory agencies, and read as follows:
(5) "The Morning Advocate, with the consent of the persons who have given the statements, has turned the statements over to state Attorney General William Guste's office, which is currently investigating corruption and influence peddling in East Baton Rouge Parish.
(6) "Copies of the statements have also been given to U.S. Attorney Doug Gonzales."
Paragraph seven relates that the District Attorney, had recused himself from conducting an investigation, and reads as follows:
(7) "District Attorney Ossie Brown recused himself from investigation of alleged wrongdoing by local officials in May when two police officers charged that Brown and Kidder had attempted to obstruct their investigation into such matters."
Paragraphs eight through eleven read as follows:
(8) "An affidavit from one barroom employee tells of Kidder coming into the lounge and accepting two cases of free liquor; the employee recounts being told by the owner that the man was Kidder and being instructed not to say anything about it to anyone.
(9) "That affidavit, supported by an affidavit from a second employee of the same establishment, recounts another incident in which Kidder and a young woman had several drinks with the owner, after which Kidder was presented with bottles of liquor, all without charge.
(10) "Most importantly, that incident occurred since Kidder has become Chief, the employees say.

*932 (11) "One of the employees states that the owner of the establishment has said they have nothing to worry about from the law because of their relationship with Kidder."
The evidence pertaining to the "Barroom Protection" aspect of the case shows with convincing clarity that the defendants' investigation led them to the conclusion that the charges against Kidder were based solely on rumor and statements of witnesses who had no evidential basis for their accusations against Kidder. There is clear and convincing evidence that the "Barroom Protection" story was of doubtful truthfulness and that the defendants' investigation led them to this conclusion; yet, they chose to publish the rumors as though they were substantiated facts.
In spite of the fact that Anderson admitted being aware of a press conference called by the Mayor during which the Mayor informed the news media that there was nothing against Kidder but rumors, all of which had been thoroughly investigated and found to be baseless, Anderson proceeded to obtain certain written statements "in support" of his story. Interestingly enough, Childers and Spillers were with him when he interviewed 15 to 20 different persons.
The statements obtained by Anderson-Childers-Spillers fail to substantiate the "Barroom Protection" charges against Kidder. Not one iota of credible evidence connected Kidder with any illegal protection racket.
Exhibit D-1 is an affidavit by Annette Kelly relating an instance when she says she saw Madge DeSoto at the Saville Bar give Kidder and a woman, supposedly, Joan Dipoala, some unopened fifths of liquor, and D-2 is a statement obtained from Yvonne Kelly, a twin sister of Annette Kelly. Madge DeSoto testified that she had known Kidder as an officer for some 20 years and that her business, Saville Bar, situated at 2231 North Foster Drive, Baton Rouge, Louisiana, was next to the Paramount Sheet Metal Company which was owned by Vic Filardo and Rosemary Paccacio, who are the brother-in-law and sister-in-law of Kidder. Madge DeSoto related that Kidder was in her bar shortly after becoming Acting Chief of Police, together with his wife, and that she gave a bottle of Kahlua to Mrs. Kidder and also an empty bottle which had an odd shape to add to Mrs. Kidder's bottle collection. She stated that nothing was given to Kidder and at that time neither of the Kelly sisters were in the bar. She also stated that she always charged Kidder for anything he got in her bar, and that she ran a small neighborhood bar, did not violate the law, and did not stay open late, so as to need any protection from any law enforcement officer. One of the Kelly sisters testified that Madge DeSoto didn't do anything which would require police protection, inasmuch as the bar did not stay open late, and did not have any gambling or prostitutes on the premises.
Exhibit D-3 is a statement obtained from officer Larry Rogers, a patrolman, about an incident which occurred in the fall of 1972 when Mario Vaccaro supposedly told detectives to do "detective work" and that he would take care of the "uniform work" none of which related to Howard A. Kidder. Exhibit D-4 is a statement of Police Detective Buller, relating to an incident which occurred at the Alibi Lounge on Florida Street when Mario Vaccaro was present, and also another incident involving another lounge some four or five years earlier, which again did not relate to Kidder. Exhibit D-5 is a statement from Officer Crittenden, relating to an occurrence which took place, either in 1971 or 1972, involving Howard Dixon, Lt. Jeter and Capt. Vaccaro at the Tijuana Club, but again did not involve Kidder.
Exhibit D-6 is a statement obtained from Officer Cain which relates to a bar being open after hours in 1972, and a conversation he had with City Councilman Delpit, and is unrelated to Kidder.
Exhibit D-7 is a statement of Frank Fuentes, a Baton Rouge patrolman, with reference to a statement allegedly made by Jim Lemming to the effect that it was going to cost him more now that Kidder *933 was Chief of Police, and that he built Kidder's swimming pool with "other" people's money. In response to this, Lemming testified that the swimming pool came up in a conversation when his mother was present and she, in a bragging way about her son, made a statement to the effect that Lemming had built the pool; that he had known Kidder casually for some fifteen years; and that Kidder had never paid him anything and there was no reason to pay him anything. Insofar as the swimming pool was concerned, Lemming testified, and this was verified by responses to interrogatories propounded to Kidder, that Kidder paid for his swimming pool and that it was built by Southern Gunite and that the work was done by his step-father, John Wilbanks. Exhibit D-8 is a statement from Samuel Pruet and relates to an incident when Wingate White was Chief of Police and Kidder was "Night Chief" and supposedly someone told Pruet, other than the individual supposedly involved, that Aaron McGuffery was paying Kidder. Anderson testified that McGuffery was called prior to printing of the story and that he denied paying Kidder for protection.
Exhibit D-9 is a statement from Officer Hilburn, and relates to an incident about not closing bars on advice of Captain Vaccaro in the autumn of 1970 through the spring of 1973. Exhibit D-10 is a statement of Officer Waller, relating to an incident at the Big Four Bar in 1970, which did not relate to Kidder. Exhibit D-11 is an investigation report involving an incident at the Famous Door Bar, which did not relate to Kidder. Exhibit D-12 is a letter of April 30, 1974, transferring and promoting Rufus Stanley Trigg to Lieutenant Colonel. Exhibit D-13 is a letter dated April 30, 1974, transferring Captain Vaccaro from the patrol division to the detective division. Exhibit D-14 is a statement obtained from Greg Phares, relating to a statement by Captain Vaccaro and when a statement was made about Vaccaro and Dr. Moody supposedly running a house of prostitution, at which time Vaccaro corrected the statement and said it was supposed to be he and Kidder who ran the house of prostitution. Vaccaro further stated that he was merely kidding; that it would have been impossible for anyone on the police force to own or operate a house of prostitution and that he had nothing to do with operating or owning a house of prostitution, and that Kidder certainly did not have any such ownership or interest.
Exhibit D-16 is a memorandum of the Baton Rouge Police Department from Major Font to Patrolman Childers transferring him from the intelligence division to traffic. Exhibit D-17 is a letter from Kidder to Childers transferring Childers from the intelligence division to the traffic division. Exhibit D-18 is a letter from Captain Satterwhite to Childers assigning Childers to office duty. Exhibit D-20 is a statement obtained from Wayne Rogillio relating a story about Dr. Moody examining prostitutes, and also a statement supposedly made by Mrs. McDuff to the effect that Fred McDuff gave Kidder an occasional fifth of whiskey Exhibit D-30 is an interview by Spillers with Tom Myers, a former policeman who said that Kidder was paid off by Saltz the Tailor, who had a bookie shop at 442 Main Street. This was refuted by Saltz, who testified that he had been in the tailoring business since 1941, when he left the Post Office, and he operated a tailor shop at 442 Main Street and has never been involved with gambling or booking. Exhibit D-31 is an interview conducted by Spillers and Crittenden for the Police Department, with Sgt. Boyd, relating a story to the effect that Boyd raided a house of prostitution that allegedly was run by Kidder, but he found no evidence of this allegation. Exhibit D-33 is an interview conducted by Childers with Jim McBride, a brother-in-law of Howard A. Kidder. Anderson used parts of this statement, although Anderson knew that he (McBride) had had major brain surgery, which affected his memory.
Exhibit D-34 is an interview of Ken Wallace, relating to the payment for certain public records.
At trial, the defendants offered additional evidence concerning the general subject *934 of payoffs and protection, but which had not been included in the articles sued upon. Willie Casing, a long-time patron of Fillup's Tavern, testified that he gambled at Fillup's Tavern from 1954 until about a year before the trial, on a weekly basis. He testified that the house cut the game which was held in the gambling room in a room next to the bar. He had seen Kidder in Fillup's a number of times. He stated that Kidder would go in the office with Rebowe,[2] but he didn't know what transpired between them.
There was more testimony in a similar vein, that tends to weaken the defense rather than strengthen it, because this testimony definitely bolsters the position that Anderson knew that the protection charges were based solely on rumor.

2. Kidder Assessment:

The evidence on the question of the "Kidder Assessment" is rather insignificant from both the plaintiff's and the defendants' viewpoint. If anything, it substantiates Kidder's contention that the defendants were out to "get" him. The reader is meant to believe that Acting Chief Kidder took some sinister advantage in obtaining a reduction in his tax assessment. The "Kidder Assessments" publications appeared within a few days of the "Barroom Protection" story. A photograph was shown in the State Times newspaper on July 17, 1974, with the caption "Kidder-Owned Duplex." The caption beneath the photograph reflected that Acting Chief Kidder owned the duplex and that he had caused its assessment to be reduced by the Assessor's Office from $3,300 to $2,300, resulting in a decrease in taxes from $186.62 to $115.92 annually. The photograph was followed by an article in the State Times on July 17, 1974, with the headline "Kidder Rental Houses Got Cut in Assessment." Then, on July 18, 1974, a photograph appeared in the Morning Advocate with the caption "Policeman's Property." The caption under this photograph pointed out that Kidder owned several parcels of land in Baton Rouge, including his home, assessed at $4,200, and a rental-house, which had its assessment reduced from $2,350 to $1,350.
The testimony of Douglas L. Manship[3] concerning the assessment publications shows that no photograph of any of the homes of other local public officials had ever been published in the newspaper in connection with tax-assessment reductions. William B. McMahon, a reporter for Capital City Press, testified that he undertook to write the articles on his own initiative after discussing Kidder's financial situation with Anderson and Spillers. He stated that he obtained all of the ownership, mortgage, and assessment information from the public records. He checked the other assessments in the neighborhood and found no similar reductions in assessments. McMahon stated that to his knowledge there was nothing untruthful in the article. McMahon then testified that Kidder took exception to the stories, and Kidder's reply was published in the State Times on July 18, 1974, and in the Morning Advocate on July 19, 1974.
The plaintiff called Frank Granger, an employee of the Assessor's Office, who testified that the reductions in Kidder's assessment was handled through regular channels. Kidder asked for reductions on three or four parcels of land. The Assessor's Office considered the request and reduced two of them. Granger testified that Kidder was treated no differently than any other taxpayer. Kidder testified that his was a routine request for reduction, because the duplex's condition had deteriorated, as well as the neighborhood in which the other rental property was located.

3. Harassment:

The two articles dealing with "Harassment" appearing in both newspapers on July 17, 1974, just illustrate the involvement of the newspapers with Officer Childers. There was no basis in fact for the newspapers to level harassment charges *935 against Kidder or the Police Department solely on information furnished by the complaining policeman. The facts show that what Childers was complaining of was his transfer from a plain-clothes officer in the intelligence division to a beat patrolman in traffic division. At the time he wrote the article concerning Childers in the Morning Advocate, Anderson knew of the animosity of Childers toward Kidder; he knew that Childers (and Spillers) were furnishing material to him (Anderson) about investigations which Childers would not even give to the commander of the Police Department, Acting Chief Kidder.

4. Police Uniforms:

With regard to the "Police Uniforms" publication, Anderson testified that the article was written by him based on a newscast made by John Spain over WBRZ-TV[4]. Anderson had no independent source for the article, and it was merely a re-write of the newscast, giving credit in its text to WBRZ-TV as the sole source. The article standing alone is of no significance. Taken in conjunction with the later articles attacking Chief Kidder, the article appears to be the forerunner of a series of articles impugning the integrity, morality and honesty of Acting Chief Kidder, since shortly thereafter the "offending statements" were published by the defendants.
The evidence shows that the activities of Kidder in connection with the purchase of the uniforms were not portrayed accurately by the news media. There was nothing unethical or irregular about his activities. The bids were not handled by Kidder, but through the Baton Rouge Central Purchasing Office, and the bid accepted finally was the only bid properly submitted.

5. House of Prostitution Involvement:

The two August 18, 1974, articles charge Kidder, Captain Vaccaro and another police officer, now retired, with having operated a house of prostitution while members of the police force in the late 1950's.
Also, on August 18, 1974 an editorial appeared in the Morning Advocate entitled "MAYOR'S INSISTENCE JUST DOESN'T HOLD," which reads in part as follows:
"The Morning Advocate today has published another in a series of serious allegations against Acting Chief Kidder. The allegation is that Kidder and two other officers operated a house of prostitution in the late 1950's and possibly longer. This is a serious charge and this newspaper would not and does not make it lightly. The charge is serious enough and well-founded enough to warrant public knowledge and consideration.
"This allegation together with others made in the recent past concerning Kidder's conduct as a police officer make it imperative that Kidder no longer be considered for the post of Chief of Police. The other charges referred to include taking payoffs for protecting certain bar owners from the law. The charges come from trustworthy members of the police department and from witnesses outside the department."
With reference to the "Kidder Prostitution House" charge, Wesley Ringgold, a lifetime resident of the area, stated that there was a house of prostitution at 1201 South 13th Street, which was run by Camille Chase from 1935 until she died some three or four years ago. Ringgold stated that he had known Kidder since about 1950 and that Kidder had nothing to do with the "house" at Julia and 13th Streets.
Additionally, Ringgold was familiar with Macie Lamotte, who owned the Apex Club and a place on Braddock Street. Ringgold stated that he never, at any time, saw Kidder come or go from the place across the street owned by Camille Chase. In connection with the closing laws and the selling of liquor, Ringgold testified he operated his place as a social club, and that "social clubs" were permitted to operate as a "country club," or other clubs, in order that the black community could have a place to socialize.
*936 The testimony of Macie Lamotte was by written interrogatories, and he stated that Howard Kidder never had any connection, directly or indirectly, with any business operated at the Braddock Street address.
To further refute the allegation that Kidder operated or had an interest in a house of prostitution, Colonel Sliman of the Sheriff's Office testified that he had worked as a partner with Kidder while with the Baton Rouge Police Department in the early 1950's and that he participated in the raid on the house located at 1510 Braddock Street, which raid occurred in November of 1953. Sliman also testified "I've never had any information to the effect that Kidder was connected with a house of prostitution." Also, Malcolm Ballard, who started with the Baton Rouge Police Department in May of 1949, testified that he had known Kidder since they were partners in the detective division during the years 1951-1953, and that he had never picked up any whiskey for Kidder, and that he never knew or heard of Kidder owning, operating, or having any interest in a house of prostitution.
Further, Lt. Col. Trigg testified that he started with the Baton Rouge Police Department in 1945, and has known Howard Kidder for more than 25 years. Lt. Col. Trigg testified that the police department raided Camille Chase's house on several occasions, but that she operated whenever she could get by. Additionally, he stated that Kidder had nothing to do with the "house" at Julia and 13th Streets and that the "house" situated at 1510 Braddock Street behind the Apex Club was raided on one occasion and closed down. Lt. Col. Trigg participated in the raid on the house at 1510 Braddock Street, which was led by Captain Duhon. Lt. Col. Trigg testified positively that Kidder had nothing whatever to do with the operation of a house of prostitution.
Captain Vaccaro testified that he started with the Baton Rouge Police Department in 1947, that at the time there were 32 men on the Baton Rouge Police force, and Vaccaro said he knew that there was a house of prostitution at Julia and 13th Streets, operated by Camille Chase, which was raided on a number of occasions by the police. He further said that in 1953 a house of prostitution opened on Braddock Street, run by a man called "Tony". Capt. Vaccaro also testified that he knew Dr. Moody well and that they were friends. Additionally, he said that Tony told him that he had been sending his "girls" to New Orleans for medical check-ups, but would like to have a doctor in Baton Rouge. Vaccaro said that he went to Dr. Moody and personally asked him about examining the "girls" for Tony. Capt. Vaccaro testified that on one occasion he rode with Kidder to Dr. Moody's office, and that Kidder advised him (Vaccaro) that Capt. Duhon had instructed him (Kidder) to find out if Dr. Moody was actually examining "girls" for this house. Capt. Vaccaro told Kidder that since he (Vaccaro) knew Dr. Moody, he would talk to him about the situation. Thereafter the house was raided by Capt. Duhon's men. With reference to police activity around these houses, Capt. Vaccaro testified:
"Q. Now, back in those days did detectives occasionally go to those places or check those places?
A. Some of us went to them quite often, businesswise I guess you'd say or trying to get information. In other words, in those days you were only as good as your source of information. In most of these places like that is where you got most of your information from."
Additionally, Capt. Vaccaro testified that in those days you didn't raid one of those houses, unless you were ordered to do so, and when interrogated as to who would set up the raids he answered:
"A. I guess it had to be Chief Duhon. He was the honcho in those days. He didn't tell us too much, you know, we were just patrolmen.
Q. Is that what you and Kidder were in those days?
A. Yes, sir, patrolmen.
Q. Did you and Kidder have anything to do with operating of those houses at all?

*937 A. No, sir.
Q. Was there any way you could operate a house?
A. No way in the City of Baton Rouge especially in those days. Like Chief Duhon, like you say they had more information on those places than we did."
Howard Kidder testified that he had never been in the house at Julia and 13th Streets, but that he had been in the house at 1510 Braddock Street on two occasions. It was his testimony that he was assigned to work this place by Capt. Duhon, and that he contacted Macie Lamotte about this, that Tony from New Orleans ran the place. Further, Capt. Duhon directed him to find out if Dr. Moody was examining the "girls," and Vaccaro informed him that he would talk to Dr. Moody about the situation. Vaccaro told him that Dr. Moody was examining the "girls," and that there was no violation of the law, which he (Kidder) reported to Capt. Duhon. Thereafter the house was raided based upon this information.
The publications with reference to Kidder operating a house of prostitution and protecting barrooms are, beyond any question, false. Anderson knew that Kidder had an administrative job on the inside of the police department from 1962 to 1974, or until he was appointed Acting Chief of Police, and that all the information concerning prostitution activities and protection of barrooms started, and ended, with rumors. In fact, all of the information obtained by Anderson concerning Kidder originated, and remained clothed, in rumor. Although Anderson investigated these rumors for two and one-half months, he found not one positive evidential fact that Kidder was involved in a protection racket, or running a house of prostitution.
Anderson denied that he ever threatened Dr. Moody to get information from him. On the other hand, Dr. Moody testified that Anderson was going to write him up as a co-conspirator if he (Moody) didn't talk to him. Anderson conceded that Dr. Moody never actually told him that Kidder was operating a house of prostitution, and Anderson said "I don't think he used those words" but that it was only Anderson's interpretation of Dr. Moody's remarks. Thus, Anderson's credibility was at issue.
Of striking importance is the testimony of Childers, who admitted that he objected to being ordered to terminate an investigation, which he had undertaken on his own behalf for a friend, and he knew that the same matter had been handled by Col. Dumigan; and, further, that he was told that if he wanted to continue the investigation he could go to the District Attorney's Office to file charges. Jane Jarreau testified that she knew Childers by his nickname "Blue", but did not know Kidder, and that Childers said to her that he was going to "get" Kidder. Although present in court at the trial, former officer Spillers did not testify.
Mayor Dumas testified that he appointed Howard Kidder Acting Chief of Police in April 1974, that he had previously had an investigation made, and that Kidder was "clean." At the time of the appointment, Mayor Dumas gave Kidder complete control of the police department, and thereafter he received a petition from over 250 officers in the police department, Exhibit P-15, praising him on the appointment of Kidder to Chief of Police.
Dr. Moody admitted the following:
"I had a personal problem, vindictiveness that went way back against Mr. Kidder. It had nothing to do with anything that's been written in the newspapers about him, probably the same thing that I read yesterday that Mr. Paul had a personal problem. He had an opportunity to take it out on Mr. Kidder and looked like he took it out on Mr. Kidder and I did the same thing I suppose. It's a terrible way to do something but I figure I got a personal problem off of my chest and just went about it the wrong way."
Further, Dr. Moody admitted that he had no knowledge that Kidder was involved in prostitution.
James H. Hughes, Managing Editor of the State Times, admitted that perhaps *938 there was some jealousy that existed against Kidder, which could have prompted some of the rumors. He did not personally get involved because "I wasn't convinced one way or the other."
We find that the jury on the record presented here could find the defendant's publication to have been made with reckless disregard of whether the statements therein were false or not. Several factors permit this finding: Under all the circumstances the publications were needlessly false. The only purpose in publishing these stories was to bring public pressure to bear on the Mayor to "get rid" of Acting Chief Kidder. The stories were given the most controversial view possible, and were deliberately slanted to portray Acting Chief Kidder as totally unfit to be a police officer.

SPECIFICATIONS OF ERRORS NOS. 3 AND 4
These assignments of error can be dealt with together, since they both are concerned with the trial court's refusal to grant a directed verdict at the end of the plaintiff's case and again at the close of the evidence. The defendants moved for the directed verdict on the ground that the plaintiff had failed to produce sufficient evidence to justify a jury finding of "constitutional malice." The trial court refused to consider the motions for directed verdict on the ground that there was no applicable Louisiana procedure for such a motion.
We agree with the trial court that our Code of Civil Procedure does not provide for a directed verdict. There is no need of a motion for directed verdict in this state. The lack of necessity for such a procedural device is clearly explained in the Preliminary Statement, Chapter 7, Book 2, Title 5, Jury Trial, as follows: "(T)here is no need for any elaborate system of controls over the irresponsibilities of the jury, since the latter's finding of fact or award of damages may be set aside if the appellate court concludes that these are not supported by a preponderance of the evidence (or, in cases of this nature, clear and convincing evidence). For these reasons, this Code does not embody the excellent jury controls to be found in the Federal Rules of Civil Procedure, and in the procedural systems of other states based thereon. These controls are badly needed in the jurisdictions which have adopted them. They would serve no particularly useful purpose in the civil procedure of Louisiana." See Joseph v. Tri Parish Flying Service, Inc., 201 So.2d 321 (La.App. 3 Cir. 1967).
Although the appellants concede that this State does not have the procedural device known as the directed verdict, State v. Placid Oil Company, 274 So.2d 402 (La.App. 1 Cir. 1972) amended in part, 300 So.2d 154 (La.1974), they urge that the failure to direct a verdict in their favor was error, due to the fact that there was no evidence of "constitutional malice" in this case.
Again, the answer on this point is found in the evidence and the reasonable inferences to be drawn therefrom. From the evidence presented by the plaintiff, particularly with regard to the abrupt change, from praise to condemnation, of Acting Chief Kidder by the press, to the involvement of the reporter with the two former policemen, and the testimony of witnesses tending to show that from his investigation the reporter had serious doubt as to the truth of the publications, the trier of fact could reasonably conclude that the publications were published with "actual malice."
Clearly, there was sufficient evidence to let the case go to the jury. There was all the more reason to let the case go to the jury at the close of the evidence, for there was a question of credibility of the witnesses in addition to the evidence of the press departing from objective reporting of the news. Evidence of such departure can be considered by the jury in determining whether there was a "reckless disregard for the truth." See Curtis Publishing Company v. Butts, supra.
We must, and do, view this case in the light of New York Times. Since New York Times, one legal principle, above all others, emerges from a study of the defamation cases; and that is that each case *939 must be viewed by the reviewing court on its own peculiar facts, with a strong inclination toward the protection of First Amendment rights. At some point, which may not be easily defined, clear and convincing evidence will show that the precious barrier has been breached, and a jury must be permitted to find "actual malice" on the part of the publisher, unless we were to adopt the Black-Douglas approach that the First Amendment grants an absolute defense for the news media to all defamation actions, which we see no reason to do in the absence of a clear expression of "absolutism" from the Supreme Court.
As stated above, in order to establish "actual malice" under the New York Times standard, the plaintiff must show that the defendants had knowledge of falsity of the statements, or a reckless disregard for the truth. If the plaintiff can not show the defendants knew that the statements were false, he must show reckless disregard for the truth. "(R)eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, supra.
Keeping in mind that evidence of "actual malice" must be "clear and convincing," more than "preponderance", less than "beyond a reasonable doubt," we now consider, as we should in First Amendment cases, to make an independent examination of the record. The articles and editorials were not "hot news." See Curtis Publishing Company v. Butts, supra. First, the newspaper published an editorial of praise. Shortly thereafter, primarily because Anderson was supporting the ex-policemen, Spillers and Childers, in an effort to get Kidder out as Chief, the newspapers published a series of articles and editorials condemning Kidder. When Anderson published the articles charging Kidder with running a house of prostitution and receiving payoffs for barroom protection, he knew that they were based on unsubstantiated rumors. When a lead produced information that Kidder was not connected with prostitution or barroom protection, Anderson chose to ignore that source and to rely on hearsay or dubious information furnished him by the two former policemen. This is the "calculated falsehood" condemned in Garrison, supra. Moreover, during all of this time the defendants were seeking advice of counsel and checking with various managing editors on the newspaper staffs as to how much further Anderson would be allowed to go with the charges against Kidder. To have directed a verdict under such circumstances would not have measured up to, but would have fallen beneath, the New York Times standard, and would have constituted reversible error on the part of the trial judge.

SPECIFICATION OF ERROR NO. 5
This assignment of error was made because the trial court refused to allow testimony by Officer Reeves relative to the so-called "Miguez" tapes.
When he testified, Kidder did not deny that many years ago he had had a telephone conversation with a gambler named Miguez. Supposedly to impeach Kidder, the defendants offered the testimony of Officer Reeves to contradict what Kidder had said the conversation was about. Plaintiff's counsel objected on the ground that the wire-tap was illegal and, consequently, any testimony relating to the tape was inadmissible. The lower court sustained the objection.
The defendants then made an offer of proof, as follows:
". . . at the time in question about which Chief Reeves started to testify, that he and his partner, Tommy Cole, picked up a wire tap on one Miguez' place. Among the calls received and while they were there in person and listening to it on head phones was a call to the police station to then I believe Captain Howard Kidder, in which the caller said that he needed to see him and arrangements were made to meet somewhere away from the police station. Upon hearing this particular call they *940 would be expected to testify that they thought they recognized the same voice as that which answered in response to the call to Captain Kidder, that they replayed the tape of earlier calls and established to their then satisfaction, although not beyond all doubt, that a number of earlier calls had been made to Captain Kidder, and that in these earlier calls arrangements were being discussed with regard to how to set up a gambling operation in the Capital House Hotel. That this was reported to then Sheriff Bryan Clemmons and they are not sure what happened to the tapes or what subsequent action if any was taken thereon. This is the testimony in general that we expected to elicit from these two witnesses. And we'd like to put that in under an offer of proof."
It is difficult to see how such testimony could be considered as impeaching evidence. It should be noted that Reeves was to be interrogated about the contents of a telephone call from Miguez to Kidder which took place in the 1950's. The tape of the telephone conversation was not available, and nothing allegedly contained therein supplied any information on which the press relied in writing or publishing the articles in question in this lawsuit. The testimony of Reeves pertaining to the taped telephone conversation has no probative value. The only possible reason to offer such testimony was to show that Kidder lied about his conversation with Miguez, but Kidder admitted the material facts contained in the offer of proof. We also agree with the trial court that the fruits of an illegal wire tap are inadmissible for any purpose in the trial of a case in this state.
We further find that 18 USCA, section 2515, prohibits the use of the proposed evidence for any purpose, including impeachment. See also 47 USCA, Section 605. However, even if there were no federal statutory prohibition, the evidence was inadmissible. Our procedural rules require identification of the tape as a condition precedent to its admissibility or to its contents' admissibility in evidence. The defendants made little or no effort to identify the voices on the tape or to authenticate the tape in a proper manner. In the complete absence of such authentication of the tape, the objection to its introduction in evidence was well taken, and the trial judge properly ruled it inadmissible. See United States Fidelity and Guaranty Co. v. Duet, 177 So.2d 302 (La.App. 1 Cir. 1965); 29 Am. Jur.2d sec. 381, p. 432.
Even if we were to hold the evidence admissible, this would not affect the decision in the instant case. It has long been the rule that unless a substantial right of the party against whom the ruling on the evidence was made is affected, such ruling will be considered harmless error and not a ground for reversal.

SPECIFICATION OF ERROR NO. 6
The defendants complain that the trial court erred in not giving sufficient instructions to the jury concerning the policy reason for the legal protection afforded by the First Amendment, and label the judge's charges as "sterile."
It would be difficult to conceive of instructions more feracious, more pertinent, more concisely stated, more thorough and yet presented in understandable language, than those given by Judge Ponder in this case. The trial judge gave definite charges pertaining to the federal rules applicable in defamation actions, both at the beginning and also at the close of the case.
We find that the trial judge fully and properly instructed the jury herein as the procedural law directs. All of the applicable law was succinctly and fully explained to the jury. The trial judge at no time indicated any partiality to either side. He at no time indicated his feelings about any fact, stressing that it was the function of the jury to find the facts. More specifically, the trial judge carefully informed the jury that the plaintiff was admittedly a public official suing a newspaper reporter and the press for defamation, and as such he had the burden of proving "actual malice" by "clear and convincing evidence." He clearly explained the meaning of "actual *941 malice" and "clear and convincing evidence" in the light of the applicable federal jurisprudence, particularly using the language of the New York Times case, which is the definitive opinion on the question of defamation involving public officials.
There was no error in the trial judge's instructions on the constitutional aspects of the case. He properly ruled that the standard enunciated in New York Times Company v. Sullivan, supra, was applicable. He charged the jury, in substance, that in order to find for the plaintiff they must find that the clear and convincing evidence shows that these particular defendants published defamatory falsehoods about the plaintiff with "actual malice." The trial judge defined the term "actual malice" and then defined "reckless disregard."
"The cases interpreting the First Amendment of the United States Constitution require that if a plaintiff is a public official he must prove that the false statement was made with actual malice, that is with knowledge that it was false or with reckless disregard for whether it was false or not.
"Reckless disregard in cases of this kind has been interpreted to mean that the defendant need not have investigated before publishing and he must have in fact entertained serious doubts about the truth of his publication at the time he published or as one case phrases it, with a high degree of awareness or probable falsity."
See Garrison v. State of Louisiana, supra.
Not only did the judge charge the jury at the close of the evidence and arguments, but he instructed the jury at the very outset of the trial, by agreement of counsel, with regard to "actual malice" and the burden of proof, and the other necessary instructions so that the jury could better understand the evidence which was about to be presented.
The judge specifically instructed the jury:
"In such cases, even though a publication be defamatory, the public official can not recover unless he proves that the defamatory statement was made with actual malice. That is with knowledge that it was false or with reckless disregard of whether it was false or not. In these cases the evidence presented must show with convincing clarity actual malice on the part of the publisher. I will define some of these terms later in the course of the trial in presenting the Court's charge of law to the jury."
In his charge the trial judge gave the general defamation law, and then specifically informed the jury that because the plaintiff admitted that he, as Acting Chief of Police, was a public official, the case was subject to the federal rules with regard to proof. The judge explained that the evidence must show with convincing clarity that all of the elements of defamation had been proved.
The judge further charged the jury that if they found the defendants liable they could only award reasonable damages of a compensatory nature; he further instructed them that they could not award punitive and speculative damages.
Although the record does not contain the requested instructions which were denied by the trial judge, the appellants have set them out in their brief. We find that the applicable law contained in the requested instructions was adequately covered in the general charges of the trial judge. It is well settled that a trial judge does not commit reversible error in refusing to give special charges where such charges are in effect included in the judge's general charges. Haynes v. Baton Rouge General Hospital, 298 So.2d 149 (La.App. 1 Cir. 1974), writ den., La., 302 So.2d 33.
The Supreme Court found, in Curtis Publishing Company v. Butts, supra, that the jury was properly instructed concerning the factors to consider to hold that the defendant acted in "reckless disregard", and remarked:
"The impact of a jury instruction `is not to be ascertained by merely considering isolated statements, but by taking into *942 view all the instructions given and the tendencies of the proof in the case to which they could possibly be applied.'
* * * * * *
"This jury finding was found to be supported by the evidence by the trial judge and the majority of the Fifth Circuit."
The Court continued:
"The evidence showed that the Butts story was in no sense `hot news' and the editors of the magazine recognized the need for a thorough investigation of the serious charges. Elementary precautions were, nevertheless, ignored. ."
Despite our finding that the trial judge committed no manifest error in his rulings or in his charges to the jury, we have made an independent examination of the entire record in the instant case, and we are convinced that the jury verdict and the implementing judgment do not constitute a forbidden intrusion on the field of free expression. See New York Times v. Sullivan, supra. We have carefully reviewed all of the evidence, as we said above, and we find that the constitutional principles of New York Times and its progeny have been constitutionally applied. There has been no infringement upon, nor impairment of, the free exercise of First Amendment freedoms. See Curtis Publishing Co. v. Butts, supra.

SPECIFICATION OF ERROR NO. 7
Alternatively, the appellants' argue that the jury's award of damages was excessive.
In considering the jury award in the instant case, we must consider it in light of the recent Louisiana Supreme Court decision of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) and in light of the "chilling effect" which the threat of potentially large defamation verdicts poses to the exercise of First Amendment rights.
Coco reminds us that, as an intermediate appellate court, we are not to disturb an award made by a trier of fact unless the record clearly reveals that the trier of fact abused its discretion in making its award.
The Coco court stated:
"Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Bitoun v. Landry (302 So.2d 278, La.1974); Spillers v. Montgomery Ward & Company, Inc. (294 So.2d 803, La.1974). It is never appropriate for a Court of Appeal, having found that the trial court abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
This Court agrees with the defendants' contention that the jury award of $400,000.00 actual damages is excessive. We are persuaded that an award in such amount would have a "chilling effect" upon the legitimate exercise of the rights of freedom of the press and would lead to undesirable self-censorship, the prevention of which has been the object and purpose of the United States Supreme Court since New York Times Company v. Sullivan, supra.
In viewing all of the evidence, we find that the plaintiff has proved $100,000.00 in actual or compensatory damages.
Under our law, in a defamation action a plaintiff is entitled to have such elements as mental anguish, humiliation and embarrassment considered by the jury in arriving at an award for compensatory damages. See Sas Jaworsky v. Padfield, 211 So.2d 122 (La.App. 3 Cir. 1968); Chretien v. F. W. Woolworth Company, 160 So.2d 854 (La.App. 4 Cir. 1964), writ ref., 246 La. 75, 163 So.2d 356.
In accordance with the dictates of Coco, we find that the record clearly supports the finding that the trier of fact abused its much discretion in making an award of $400,000.00; consequently, we must lower the award to the sum of $100,000.00, *943 the highest point which is reasonably within the range of the discretion of the trier of fact. In fixing the award, we have reviewed prior reported decisions but have placed no particular emphasis on the awards in those decisions, inasmuch as it is hardly discernible by gleaning the facts from them that we should fix a like quantum judgment in the instant case, none of them being fully apposite. We have, of course, taken into consideration, in light of our ever-changing society, various factors: the plaintiff has had to expend much time and expense in connection with this litigation; he has been and will be adversely affected in his chosen employment as a law enforcement officer; he has been severely humiliated and embarrassed, and has suffered considerable mental distress by these defamatory publications; and, also, the plaintiff's reputation has been greatly injured by these defamatory publications. We have also heeded the insulating effect of New York Times in order not to approve of an award which might constitute a threat to the defendants' legitimate exercise of their First Amendment rights.
We find, for the stated reasons, that an award of $100,000.00 falls reasonable within the range of discretion which is vested in the trier of fact, and yet will not threaten or diminish freedom of the press. Thus, the judgment, being excessive under the appropriate standards, is amended to reduce the award to the sum of $100,000.00, and as amended the judgment is affirmed. Costs shall be paid by the defendants-appellants.
AMENDED AND AFFIRMED.
LOTTINGER, Judge, dissenting and concurring.
I concur in the majority's conclusion that the jury award of $400,000.00 was excessive, and should be reduced to $100,000.00, however, I cannot agree with those statements contained therein that a $400,000.00 award would have a "`chilling effect' upon the legitimate exercise of the rights of freedom of the press and would lead to undesirable self-censorship, * * *."
I respectfully dissent, however, from an affirmance of the Trial Court judgment as to the question of liability. This suit should have been disposed of in favor of the defendants on their motions for summary judgment.
Defendants filed two partial motions for summary judgment, the first covering an article appearing in the Baton Rouge Sunday Advocate on July 14, 1974, and the second covering articles appearing on June 12, July 16, July 17 (two articles), July 18, and August 8 (two articles), all in 1974.
In an affidavit of defendant, Bob Anderson, attached to the first motion for partial summary judgment, defendants analyzed each sentence of the July 14, 1974, article, setting forth from whom the information was obtained, and that the defendants had no reasons to disbelieve the information contained therein. There were some twenty-three individuals mentioned in the affidavit who gave information, some by affidavit, some by signed statements, and others by oral statements, which in some cases were later reduced to affidavits. Copies of the affidavits and signed statements were attached to the motion.
The plaintiff in opposition to this partial motion for summary judgment filed his lone affidavit. This affidavit contained a complete quote of a complimentary editorial appearing on May 2, 1974, in the States Times newspaper, a sister paper of the Morning Advocate. It further set forth that even after the publication of this complimentary editorial, the defendants commenced an investigation of the plaintiff, and obtained statements from individuals with full knowledge that these individuals were out to "get Kidder". The opposition affidavit further sets out that the statements obtained contained nothing more than hearsay, that the defendants did not make direct contact with the individuals allegedly involved so as to verify the facts contained in the statements, that the facts contained in the statements were false and untrue, that the defendants knew or had reason to know that they were false, that the defendants or representatives of the *944 defendants threatened to expose certain individuals if they did not give statements concerning the plaintiff, and that after responding to certain interrogatories the defendants continued to make inquiry of certain individuals, having known of them prior to the publication of the July 14 article, and having failed to contact them prior thereto. In concluding the affidavit, the plaintiff alleges that the defendants knew of the plaintiff's qualifications and back-ground as a law enforcement officer and that for reasons best known to the defendants they in bad faith attempted to obtain information from disgruntled individuals who could only furnish hearsay testimony so as to defame the plaintiff. In answer to certain interrogatories propounded by the defendants to the plaintiff, the plaintiff names various individuals that he intended to call as witnesses on his behalf, and in particular those he would call to prove malice as well as three individuals who purportedly heard plaintiff make the remark "I'll get Kidder".
In support of its second motion for partial summary judgment the defendants filed affidavits as to each article setting forth the particulars. In addition to affidavits by those individuals who prepared the articles, there were also attached statements by individuals who gave information to the reporter involved.
In opposition to this motion for a partial summary judgment, the plaintiff filed an affidavit of one Fred King who set forth very basically that he knew the defendant Bob Anderson as well as some of his informants, that he joined in their effort to obtain information against Howard Kidder and actually made a trip to Biloxi, Mississippi to inquire into the alleged ownership of a boat, all to no avail. He further stated in his affidavit that Anderson told several individuals in his presence that if they kept coming up with information on the plaintiff that he could keep his name in the newspaper, but that Fred King could never find anything against Howard Kidder that could be verified and so informed those with whom he was participating, and that in spite of the fact that none of the information of the rumors could be verified the defendant continued in his efforts to discredit Kidder. In addition to the affidavit of Fred King, the plaintiff also filed an affidavit of Mayor Woodrow W. Dumas, of Baton Rouge. Mayor Dumas' affidavit sets forth that he informed certain reporters and employees of the defendant that there was nothing to the rumors concerning Howard Kidder. The plaintiff also filed his own affidavit, which simply disputed facts contained in the articles. It further stated that he had never been questioned by the defendants as to any of the articles nor did they make any effort to verify or discuss with him the facts contained therein.
The United States Supreme Court in the landmark decision of New York Times Co. v. Sullivan, 376 U.S. 254, 269-270, 279, 84 S.Ct. 710, 720-721, 11 L.Ed.2d 686 (1964) said:
"The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, `was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498. `The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117. `[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions,' Bridges v. California, 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192, and this opportunity is to be afforded for `vigorous advocacy' no less than `abstract discussion.' N. A. A. C. P. v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405. The First Amendment, said Judge Learned Hand, *945 `presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.' United States v. Associated Press, 52 F.Supp. 362, 372 (D.C.S.D.N.Y.1943). Mr. Justice Brandeis, in his concurring opinion in Whitney v. California, 274 U.S. 357, 375-376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, gave the principle its classic formulation:
`Those who won our independence believed * * * that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by lawthe argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.'
"Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials."
* * * * * *
"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not."
The Supreme Court further concluded that the "constitutional standard demands" that "actual malice" be proved with convincing clarity.
Therefore, the issue in this case is not the truth or falsity of the statements published, but rather, whether the statements were published with actual malice, that is, with knowledge that they were false or with reckless disregard of whether they were false or not. It is not the negligent publication that we are here concerned with but rather the publication with the reckless disregard to the truth. Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Reckless conduct vis-avis negligence in the publication of statements concerning a public official is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication. The mere failure to investigate does not in itself establish bad faith. St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).
These three keystone cases from the United States Supreme Court set forth the standard of conduct that the defendant must be found in violation of before he can be found at fault or liable for the publication. Unless the plaintiff can show with convincing clarity that the defendant has breached this rule of conduct, he cannot recover.
Unquestionably, summary judgment is a proper procedure for affording the constitutional protection of the First and Fourteenth Amendments in a proper case. Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858 (5th Cir. 1970) and Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969).
*946 Under what criteria must a judge decide a motion for summary judgment in a defamation suit by a public official? Does he use the traditional criteria applicable normally to all cases, or do the First and Fourteenth Amendments mandate a different criteria?
In Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 967 (1966), Judge Wright in speaking for the Court said:
"A motion for summary judgment should be granted where it is shown that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. In deciding whether a genuine issue of fact is raised in any case, a number of general considerations are relevant. First, the right to trial by jury is at stake, so courts must be ever careful to grant summary judgment only when no issue of fact is controverted or turns upon a choice between permissible inferences from undisputed evidence. See Pierce v. Ford Motor Co., 4 Cir., 190 F.2d 910, cert. denied, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951). This need for care has given rise to valid generalizations that summary judgment must be denied when there is `doubt' whether an issue of fact has been raised, and that summary judgment is not usually appropriate when the issue raised concerns a subjective state of mind.
"These generalizations do not, however, relieve courts of their responsibility to decide whether a genuine issue of fact exists. That doubt concerning the issue should be resolved against the movant may assist courts in disposing of troubling cases after deliberation, but it provides no assistance in the deliberative process itself. That state of mind should generally be a jury issue does not mean it should always be so in all contexts, especially where the issue is recklessness, which is ordinarily inferred from objective facts. Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. Asbill & Snell, Summary Judgment Under the Federal RulesWhen an Issue of Fact is Presented, 51 Mich.L.Rev. 1143, 1144 (1953).
"In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the Times principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, especially to advocates of unpopular causes. All persons who desire to exercise their right to criticize public officials are not as well equipped financially as the Post to defend against a trial on the merits. Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of law suits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for the self-censorship affecting the whole public is `hardly less virulent for being privately administered.' Smith v. People of State of California, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959)."
Further, in Thompson v. Evening Star Newspaper Co., 129 U.S.App.D.C. 299, 394 F.2d 774, 776 (1968) the court said:
"Since the very pendency of a libel action may cut across the public interest in free and untrammeled speech on public issues, a public figure cannot resist a newspaper's motion for summary judgment under Rule 56 by arguing that there is an issue for the jury as to malice unless he *947 makes some showing, of the kind contemplated by the Rules, of facts from which malice may be inferred."
And again in United Medical Laboratories v. Columbia Broadcasting System, 404 F.2d 706, 712 (9th Cir. 1969) it was said:
"In order to recover, United Labs would have to prove with `convincing clarity' that the statements of the publications, if they could be defamatory of it, were made with knowledge that they were false in their alleged implications against it or were made with reckless disregard of whether they were false or not. And in order to be entitled to proceed in this respect, United Labs could be required to show, on proper challenge such as by the motion and showing for summary disposition here, that it had sufficient probative substance to be able litigably to give rise to an issue of fact on whether such malice actually existed or not."
And as the court said in Ragano v. Time, Inc., 302 F.Supp. 1005, 1010 (M.D.Fla.1969) in discussing the plaintiff's burden where the defendant has moved for summary judgment:
"Perhaps in no other area of civil litigation is the burden so ominous as in the law of defamation. To survive summary judgment proceedings it is necessary that he offer some evidence upon which a jury could find convincing clarity of actual malice or reckless disregard. The decisions require that he come forward with evidence of the defendant's state of mind; in effect, he must prove a negative. There must be `* * * sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts.' [St. Amant v. Thompson, supra]."
It is not sufficient to withstand a motion for summary judgment that the moving party's motion for summary judgment merely alleges malice, and courts are not persuaded "that the fact that the newspaper reporter did not seek out the plaintiffs personally to get their version of the dispute would support an inference of actual malice on the part of the defendant." Hurley v. Northwest Publications, Inc., 273 F.Supp. 967, 974 (D.Minn.1967).
It is well stated in F & J Enterprises, Inc. v. Columbia Broadcasting Systems, Inc., 373 F.Supp. 292, 297 (N.D.Ohio 1974) that:
"Although courts are loathe to grant a motion for summary judgment, particularly `of a case of any complexity,' S. J. Groves & Sons v. Ohio Turnpike Comm'n, 315 F.2d 235, 237 (6th Cir. 1963), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57; Hart v. Johnston, 389 F.2d 239 (6th Cir. 1968), and generally construe pleadings, affidavits and the like in a light most favorable to the opposing party, the courts have often required a more rigid compliance with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure when the action involves the defendant's First Amendment Rights since prolonged litigation might have a `chilling effect' on the exercise of such rights. Time, Inc. v. McLaney, 406 F.2d 565, 566 (5th Cir. 1969), cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).
"Consequently, the courts have imposed a heavy burden upon the plaintiff seeking recovery in a defamation action involving the First Amendment rights:
`Summary judgment is an integral part of the constitutional protection afforded defendants in actions such as this. Plaintiff has been purposely given the heavy burden of proving actual malice. . . When it has been established, as it has been in this case, that he cannot meet it, the First Amendment makes it incumbent upon the Court to grant defendant's motion for summary judgment.' Cerrito v. Time, Inc., 302 F.Supp. 1071, 1075-1076 (N.D.Cal.1969), aff'd per curiam, 449 F.2d 306 (9th Cir. 1969).
"In United Medical Laboratories v. Columbia Broadcasting System, supra, 404 F.2d at 713, 712, with respect to `primary question on the federal rule and standard. . . of actual malice' the Ninth Circuit held that a plaintiff `could be required to show, on a proper challenge *948 such as by the motion and showing for summary disposition here, that it had sufficient probative substance to be able litigably to give rise to an issue of fact on whether such malice actually existed or not.'"
The court then concluded that in light of this strict federal standard as set forth in New York Times and the most recent decisions, the plaintiff is required to prove with convincing clarity, when confronted with a motion for summary judgment and supporting documents, the existence of elements with sufficient probative substance to provide a basis for a finding that a defendant had knowledge of falsehood or serious doubts as to the truth of the alleged defamatory statements.
I am convinced after a close and thorough reading of the federal cases, from New York Times on, that the burden placed upon a plaintiff in defeating a motion for summary judgment is a most severe and difficult challenge to meet, though not impossible. He cannot merely allege malice or reckless disregard, nor hope to prove malice by questioning the defendant or defendant's witnesses. Where in the ordinary type of case he could be successful in defeating the motion by only putting forth a minimum of evidence, here he confronts the guarantees of the First and Fourteenth Amendments, and thus stands the risk of the motion being successful if he cannot at this stage of the proceedings show that he can produce sufficient evidence on the trial that will prove with "convincing clarity" the defendant's malice. Stated another way, I am convinced that the single thread that is woven throughout this entire fabric is that in order for plaintiff to be successful on the threshold issue of summary judgment, he must come forth with strong evidence, convincingly clear evidence, that the defendant either knew the statements published were false or that he had reckless disregard of whether they were false or not. Otherwise, if plaintiff is allowed to escape summary judgment by simply a minimum showing, he has thus effectively invoked the "chilling effect" of trial doctrine.
The Louisiana and Federal Summary Judgment Rules are basically the same. See LSA-C.C.P. Arts. 966-967 and Rule 56, Federal Rules of Civil Procedure. The Louisiana Code of Civil Procedure can require nothing less from the plaintiff in cases of this nature at the summary judgment stage of the proceedings than have the federal courts under the federal rules because of the federal constitutional questions involved.
The majority contends that the affidavits filed by defendants in support of their motions for summary judgment are of no moment because they were not based on personal knowledge of the affiants as required by LSA-C.C.P. 967. Again the issue is not the truth or falsity of the statements published, but rather, whether the statements were published with actual malice, that is, with knowledge that they were false or with reckless disregard of whether they were false or not. Though the information appearing in the affidavits and statements by the various informants is the rankest of hearsay, they would be admissible on the merits as being offered not for the truth of the information contained therein, but simply being offered for the fact that the defendants were told this information by these informants, and this goes to the issue of malice.
Each defamation suit by a public official on the threshold issue of summary judgment must be decided on its own facts. The earlier case by this court of Batson v. Time, Inc., 298 So.2d 100 (La.App.1st Cir. 1974), writ denied, La., 299 So.2d 803 (1974), with notation "judgment not final" is only dispositive of the issue as to whether the plaintiff in that case set forth sufficient evidence in opposition to the motion for summary judgment.
After reviewing all of the interrogatories, affidavits, and any other evidence as well as the inferences reasonably drawn from them in a light most favorable to the plaintiff, I am convinced that the plaintiff has not made a sufficient showing in opposition to the motion for summary judgment of his *949 ability to prove malice on the part of the defendants with convincing clarity.
It is, therefore, for these reasons that I believe the Trial Judge was in error in refusing to grant both motions for partial summary judgments and my esteemed brethren of the majority fell into error in affirming the action of the Trial Court.

ON MOTION TO SUPPLEMENT RECORD
PER CURIAM:
Upon suggestion of defendants-appellants, Bob Anderson and Capital City Press, Inc., that copies of special jury instructions requested by defendants-appellants and refused by the trial judge, which refusal was timely excepted to, had been inadvertently omitted from the record in this matter, and that the record should be supplemented at this time so that the Specification of Error No. 6 dealing with this aspect of the case could be properly considered by this Court, we grant the motion to supplement the record to include the omitted instructions.
We ruled, upon objection made by counsel for appellee, that the motion to supplement the record to include the requested instructions made during oral argument by counsel for appellants was not timely and the questions concerning the refused instructions were not properly before the Court. Upon reflection, we concluded that the requested instructions formed a vital part of the question of a constitutionally fair trial in a First Amendment case, and the concept of fair play, if you will, demanded that we consider the refused instructions. The Specification of Error dealing with this aspect of the case was fully briefed by counsel for both parties and treated by counsel as a matter to which they had or were going to stipulate to, so that a technical or procedural question as to the refused instructions being properly before this Court was not a real issue.
In our original opinion we viewed the question as properly before us and dealt with the question of the refused instructions under "Specification of Error No. 6." We have again reviewed the refused instructions and the contentions of counsel regarding this question. We adhere to our original opinion that Judge Ponder fully and clearly explained the applicable law to the jury. He properly ruled that the New York Times standard was applicable in this case where an admittedly public official was suing the reporter and the newspaper for defamation. He instructed the jury correctly that the plaintiff had the burden of proving with convincing clarity that the publication was made with actual malice, and the other necessary elements. He clearly explained the terms used in his charges so that a juror could easily understand their meanings. We find that all of the appropriate special charges were included in the charges given by Judge Ponder to the jury. A trial judge does not commit reversible error in refusing to give special charges which are in effect included in his general charges.
As stated by the United States Supreme Court in Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967):
"The impact of a jury instruction `is not to be ascertained by merely considering isolated statements, but by taking into view all the instructions given and the tendencies of the proof in the case to which they could possibly be applied.' Seaboard Air Line R. v. Padgett, 236 U.S. 668, 672, 35 S.Ct. 481, 482, 59 L.Ed. 777."
Certainly, the taking into view of all instructions given by Judge Ponder can lead only to the conclusion that he properly instructed the jury in this case.
Furthermore, the trial judge properly denied the requested instructions because they do not appear to have been totally true, and would have merely served to mislead the jury. See Iverson v. Jahncke Services, Inc., 301 So.2d 886 (La.App. 4 Cir. 1974), writ denied, La., 304 So.2d 670.
In addition to the ground concerning the refused instructions, the appellants seek a rehearing on the ground that this Court erred in not holding that the trial judge improperly denied their two motions for *950 partial summary judgment. We find that this question has been fully considered by us. We adhere to our original opinion that there were genuine issues of material facts so that the case was not in a proper posture for disposition by summary judgment.
The other grounds for rehearing merely reiterate the appellants' original arguments and are equally without merit.
REHEARING DENIED.
NOTES
[1] The United States Supreme Court does not even intimate in New York Times that it is imposing that burden of proof "by convincing clarity" on a defamed public-official-plaintiff in the pre-trial stage. In fact, the court rejected the absolute-immunity doctrine continuously espoused by Justices Black and Douglas in all First Amendment situations. To require a plaintiff to convincingly prove a highly subjective factor in the pre-trial stage is to surreptitiously invoke the absolute-immunity doctrine which has been repudiated. We do not feel that this Court, in the matter before us, should be in the vanguard in advocating such an insupportable jurisprudential stance.
[2] He was the owner of the tavern.
[3] He is named on the masthead as the publisher of the newspapers.
[4] The television station is also a Manship enterprise.