390 So.2d 556 (1980)
Robert M. McHALE, Plaintiff and Appellee-Appellant,
v.
LAKE CHARLES AMERICAN PRESS et al., Defendants and Appellants.
No. 7756.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1980.
Rehearings Denied December 1, 1980.
*557 Jones, Patin, Tete, Nolen & Hanchey, William M. Nolen, Lake Charles, Frank W. Middleton, Jr., of Taylor, Porter, Brooks & Phillips, Baton Rouge, for defendants and appellants.
Christopher J. Roy, Alexandria, McHale, Bufkin & Dees, Michael K. Dees, Lake Charles, for plaintiff and appellee-appellant.
Before CULPEPPER, DOMENGEAUX and CUTRER, JJ.
CULPEPPER, Judge.
The plaintiff, Robert M. McHale, sues the defendant, Lake Charles American Press, and its publisher, W. Hugh Sherman, for damages caused by a defamatory editorial. The trial judge awarded plaintiff compensatory damages in the sum of $150,000, but rejected plaintiff's claim for punitive damages and attorney's fees under LSA-C.C. Article 2315.1A. The defendants appeal. Plaintiff also appeals, seeking punitive damages and attorney's fees.
*558 The district judge has written a thorough opinion with which we agree, except for the denial of attorney's fees on the grounds that plaintiff is himself an attorney. With the exception noted, we adopt as our own the following opinion of the trial judge:
"This is a defamation action arising out of an editorial published by the Lake Charles American Press on July 21, 1977. Entitled `What's story behind McHall reappointment?', the editorial attacked the reappointment of Robert M. McHale as City Attorney of Lake Charles. It made a number of statements critical of him. In his petition, McHale alleged several statements were actionably defamatory. At the beginning of trial, he announced he would concentrate on but one. The Court does likewise. That statement is:
"No bond buyer would buy a nickel's worth of securities on McHale's opinion.
"Plaintiff McHale is an attorney. Defendant Lake Charles American Press, Inc., is the corporate owner of the newspaper `American Press'. Defendant W. Hugh Shearman is the publisher. He is also the author of the above quoted statement.[1]
"McHale has practiced law in Lake Charles since 1956 when he graduated from Tulane University Law School and was admitted to practice in Louisiana. In 1965 he was appointed City Attorney for Lake Charles. Two years later he became attorney for the Lake Charles Harbor and Terminal District, representing the Port of Lake Charles. One of his duties for these public bodies was legal advice in public finance. As such, he was involved in numerous issues of certificates of indebtedness, paving certificates and sewerage certificates issued by the City, and certificates of indebtedness issued by the Port. Most of these securities were sold to investment buyers on the strength of his opinion alone, but for the larger issues he associated the services of a law firm in Baton Rouge, Benton, Benton & Benton, whose sphere of recognition as bond specialists was broader than his.
"In his petition against these defendants, filed five days after the editorial, McHale alleged that the statement attacked his professional competence, particularly his competence in his specialty legal field of bonds and other public securities; that the publication caused him loss of reputation, respect and integrity, both in his private and in his professional life; and that the publication was made with actual knowledge of its falsity or with reckless disregard of whether or not it was false. He asked for damages.
"Defendants responded with the defense that the statement was true, or substantially so, and, in the alternative, they denied that they were culpably aware of its falsity or in reckless disregard of whether or not it was false.
"The editorial is here reproduced in its entirety. The statement sued on appears at the end of the fifth paragraph.

*559 What's story behind McHale reappointment?
The reappointment of Robert M. McHale as Lake Charles city attorney smells to high heaven. Is it any wonder that the public has lost faith in persons who hold offices of public trust?
We are appalled that Mayor William Boyer, who became the city's chief executive with a reputation for public spirit, could see fit to cram McHale's appointment down the throats of taxpayers.
McHale has lived well at the public trough for over a decade, reaping thousands of dollars in personal wealth from fees he has been paid for bond issues, legal opinions and other assorted fees.
Boyer has promised to make a full accounting of all fees, salaries and expenses paid to McHale by the city over the past 10 years. We expect him to hold to this promise.
We will not be content to rest until we have determined to the penny how much McHale has been paid by the city. It is a matter of public record and the public deserves the full story. The bond fees are totally unnecessary and are a waste of taxpayers' money. No bond buyer would buy a nickel's worth of securities on McHale's opinion.
Boyer's image has been badly tarnished by his cozy relationship with McHale and his stubborn refusal to name someone else city attorney. The city is loaded with legal talent and we will never understand why Boyer is so determined to give the post to a controversial attorney.
McHale is the man, you may recall, who teamed with three other persons with political clout to wring over a million dollars in profits from the state when the group leased the former Sears building on the downtown mall.
As if that wasn't political favoritism at its worst, we now have to listen to Woody Watson, president of the Lake Charles City Council, defend the "sweet deal" lease. Watson, by the way, is a business associate of Boyer's.
McHale was just a good businessman, Watson said, and if the state paid too much rent money, that was the state's problem. Just who does Watson think the state really is? The state is you and me and we don't like to be suckered by anybody.

American Press Editorial
We wonder how much longer the taxpayers will stand for public funds being siphoned off for the benefit of politicians and their cohorts.
McHale has also promised he will give the public the full story of how much he has earned as city attorney. We wonder if his report will include the names of other local citizens who have shared in the tax funds he has received from the city and a list of funds he may have received from others who have performed work for the city.
Meanwhile, the people of Lake Charles are waiting for Boyer and Watson to explain the reasons for their unqualified support of McHale. The voters put both men in office and they have a right to demand what's behind the McHale reappointment. We are waiting impatiently for answers, fellows.
What are you up to now?

*560 "LAW
"McHale was a public official. This case must accordingly be decided on the principles established by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Louisiana Supreme Court in Kidder v. Anderson, 354 So.2d 1306, at 1308 (La.1978), states the New York Times standard regulating recovery of damages by a public official claiming defamation:
"A public official may not recover damages for a defamatory statement, even if false, relating to his official conduct `unless he proves that the statement was made with "actual malice"-that is, with knowledge that it was false or with reckless disregard of whether it was false or not'. New York Times Company v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Moreover the public official plaintiff must meet this burden not merely by a preponderance of the evidence, but with `clear and convincing proof'. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974)."
"The United States Supreme Court recently said in Herbert v. Lando, 441 U.S. 135, 99 S.Ct. 1635, at 1645, 60 L.Ed.2d 115 (1979):
"[I]n the 15 years since New York Times, the doctrine announced by that case, which represented a major development and which was widely perceived as essentially protective of press freedoms, has been repeatedly affirmed as the appropriate First Amendment standard applicable in libel actions brought by public officials and public figures. Curtis Publishing Co. v. Butts [388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094] supra; St. Amant v. Thompson [390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262] supra; Gertz v. Robert Welch, Inc., supra; Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). At the same time, however, the Court has reiterated its conviction-reflected in the laws of defamation of all of the States-that the individual's interest in his reputation is also a basic concern. Time, Inc. v. Firestone, supra, at 455-457, 96 S.Ct., at 966; Gertz v. Robert Welch, Inc., 418 U.S., at 348-349, 94 S.Ct., at 3011."
"There are no concrete guidelines applicable to specific fact situations by which proof of knowing or reckless falsity can be measured. Reckless disregard will depend for its ultimate definition on the marking out of its outer limits through a case by case adjudication. St. Amant v. Thompson, 390 U.S. 727 at 730, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). `[T]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of its publication.' Id., 88 S.Ct., at 1325. Neither negligence nor failure to investigate on the one hand, nor ill will, bias, spite, or prejudice on the other, standing alone, are sufficient to establish either a knowledge of the falsity of, or a reckless disregard of the truth or the falsity of the materials used. But evidence of negligence, of motive and intent, may be adduced for the purpose of establishing by accumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), Goldwater v. Ginzberg, 414 F.2d 324 (2nd Cir. 1969), cert. denied 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). Herbert v. Lando, supra, discusses at length the range of permissible evidence going to prove knowledge or reckless disregard: `Courts have traditionally admitted any direct or indirect evidence relative to the state of mind of the defendant and necessary to defeat a conditional privilege or enhance damages'. 99 S.Ct., at 1643. Also, `to be liable the alleged defamer of public officials ... must know or have reason to suspect that his publication is false' and the `proof of the necessary state of mind [can] be in the form of objective circumstances from which the ultimate fact [can] be inferred'. 99 S.Ct., at 1641.
"The Court will now proceed to discuss this `state of mind' evidence, remembering as mandated by Kidder v. Anderson, 354 *561 So.2d 1306, at 1308 (La.1978) that state of mind must be judged:
"... not on the basis of an evaluation of sworn testimony at a trial (after full opportunity to rebut accusations) but rather on the basis of information available to the [news personnel] at the time of publication."

"THE EVIDENCE
"The elements of plaintiff's case are (1) publication, (2) defamation, and (3) knowing or reckless falsity.
"The first two elements, publication and defamation, present no difficulty.
"There is no question that the statement was published, that is, actually communicated to others. The American Press is a daily newspaper with wide circulation throughout the southwest area of Louisiana where plaintiff is engaged in the practice of law.
"The defamatory effect of the statement is apparent with equally convincing clarity. No one could dispute this. No witness did. According to the testimony of attorneys, bankers, investment experts, public officials, a clergyman, and others, McHale enjoyed a good reputation generally, and a good reputation specifically in the field of public finance. The statement `No bond buyer would buy a nickel's worth of securities on McHale's opinion' directly attacked and damaged his reputation within his profession. It articulated as a fact a condemnation that portrayed him as a totally incompetent bond attorney.
"What would this sentence in context convey to the ordinary reader? It was inevitable, in my opinion, that the great majority of readers interpreted it exactly for what it said, that McHale's opinion on securities was worthless to any bond buyer. Since he had been identified in the editorial earlier as an attorney who `has lived well at the public trough ... reaping thousands ... in personal wealth from fees he has been paid for bond issues, legal opinions and other assorted fees', I believe the average reader got the impression that not only was he an incompetent attorney, whose opinions on securities were worthless, but that there was also some dishonesty connected with his acceptance of fees for bond issues and legal opinions without having rendered a legal service. The statement was defamatory.
"Most of the evidence in the case focused on the third element, knowing or reckless falsity. Before going into a point by point analysis of the evidence as it bears on conduct and state of mind, it is necessary to briefly discuss the editorial's subject matter and the history of that subject matter.
"A year and a half before this editorial was written, McHale had resigned his post as City Attorney, retaining his job as Port Attorney but otherwise devoting himself full time to his private law practice. In 1974 he had been under considerable fire from the newspaper because of a transaction in which a corporation owned by him and four friends had business dealings with the State of Louisiana. This corporation, Ryan St. Properties, Inc., leased from its owners a building on the downtown mall of Lake Charles formerly occupied by Sears, Roebuck. Knowing that the State was interested in moving its scattered welfare offices to one location, the corporation succeeded in negotiating a lease with the State to house this office in the Sears building. The Press criticized this transaction in a series of some 19 news articles during 1974, on the ground that since the five owners, including McHale, were political figures, political influence was apparent, and also on the ground that the lease rate to the State was excessive. This transaction will hereafter be referred to as the `Sears lease'. It is one of the stated editorial reasons for the Press' opposition to McHale's reappointment, which occurred by appointment of the Mayor and approval of the City Council on July 6, 1977.
"The editorial, it can be seen, sets out two basic reasons for the newspaper's opposition to plaintiff's reappointment: the first, in the language of the editorial itself, was the `fees he has been paid for bond issues, legal opinions and other assorted fees'; the other, his involvement in the Sears lease.
*562 "To prove that the defamers knew or had reason to suspect that the editorial statement was false, plaintiff's evidence focused on conduct and state of mind, and objective circumstances from which the ultimate fact might be inferred. The evidence of knowing or reckless falsity may be grouped into the following categories:
"1. The news articles published earlier about the Sears lease.
2. The publisher's knowledge of exculpatory information (the appraisals) about the Sears lease which he failed to disclose to his editors or the reading public.
3. An American Press reporter's personal interview with McHale one or two days before the editorial was published, and the contents of a related news article published in the same edition of the paper as the editorial on July 21, 1977.
4. The preparation of the editorial and its contents.
5. Numerous prior legal advertisements in the newspaper naming McHale as having rendered the approving legal opinion on a number of offerings of securities.
6. The publisher's personal knowledge based on his membership on the Board of Directors of a local bank, and
7. Other evidence.
"The Court will proceed now to a discussion of these seven categories.
"1. The Sears Lease
"The Sears lease came to light in early 1974. It was exhaustively treated in news articles throughout that year. The difference between the rent paid and the rent obtained suggested a substantial profit. The rent paid was $3,000 a month. The rent from the State called for $17,000 a month. Calculated on a ten year primary term, the square foot rent obtained was $5.50 per year. Among other conditions of this recorded lease, the company bound itself to completely renovate the building in accordance with detailed plans and specifications, pay base rate utilities, and purchase land to provide a parking lot for 200 cars.
"Beginning January 23, 1974 and continuing through August 27, 1974, the American Press published 19 news articles about this lease. Sixteen named McHale and the others. These articles suggested that the State paid too much rent based on the visible disparity between the square foot rental paid by the lessors and what the State paid them. There was also the suggestion of political patronage because the five lessors were supporters of the Governor of Louisiana. The headlines employed words like `sweet deal', `skullduggery', `robbery' and `fraud'.
"Plaintiff offers these articles as the first evidence of state of mind. He says that although they appear as news articles, they clearly reveal the Press' opinion of the Sears lease and its design to impress that opinion on its readers. He urges that this design was achieved by slanting, the deliberate and repetitious use of facts favoring its interpretation of the lease, and the suppression of equally known facts which had they been published, would have given the reader a choice of what to believe.
"The Court has carefully read these 19 news articles. Most of them appear to be somewhat lacking in objectivity. They partake more of the style of an advocate than that of an unprejudiced journalist. One gets the impression that by emphasis, connotation and repetition, the authors were intent on developing a precise theme, that the transaction was fraught with politics and a cheat to the public fisc. At the trial, when asked to explain what hard evidence existed of political manipulation and excessive rent charged to the State, the answers by defense witnesses were uniform: all five lessors were known to be political supporters of the Governor and the lease to the State on its face showed a large profit when compared to the price originally paid by the investors. Beyond that, these witnesses were either unable or unwilling to state facts which reasonable minds would expect to exist to bridge the gap between *563 suspicion of wrongdoing and wrongdoing itself.
"However slanted these news articles may have been, they are First Amendment protected.
"It should also be observed that McHale was not singled out for special treatment in any of these 19 articles. The condemnation of political influence and excessive rent was leveled equally on all five of the participants.
"2. The Appraisals
"Three years later the editorial of July 21, 1977 was published and it said:

"McHale is the man, you may recall, who teamed with three [sic] other persons with political clout to wring over a million dollars in profits from the State when the group leased the former Sears building on the downtown mall.

When this language was penned, W. Hugh Shearman knew something that neither his editors nor the reading public knew. He knew there existed three real estate appraisals which unanimously indicated that the rent was not excessive, but that in fact it was representative of fair market lease value.[2]
"These appraisals came about in the following manner: Back in 1974 these five investors, smarting under the pain of the 19 news articles and wanting to prove that the lease was not unfair to the State, suggested that appraisals be obtained by all interested parties. The evidence convinces the Court that the Governor, the investors, and the Press agreed that each would procure an appraisal. Appraiser Richard Pease of Lake Charles completed one for James Sudduth (one of the investors) on October 28, 1974. Leroy Cobb, an MAI of Baton Rouge, delivered one to the Governor on November 20, 1974. Holley Heard, an appraiser of Lake Charles, completed one for the American Press on January 14, 1975. These were reduced to writing in formal appraisal reports. In each case, the appraiser undertook to evaluate the lease in terms of fair market value as of January, 1974. Each supported the view that the square foot rate paid by the State represented the fair market lease value of the property.
"The proof falls short of establishing that Shearman and the Press agreed to any specific use of the appraisals. Some purpose was envisioned, obviously, otherwise the agreement would have been pointless. It was the testimony of the lessors that they had bound themselves to rewrite the lease to conform to the appraisals, had there been a difference.
"Shearman admitted that shortly after January 14, 1975, he was aware of the contents of all three appraisals. The evidence also shows that he did not make known their existence to any of his editors until one week before the trial of this case. He insisted, at trial, as did the editor who learned about the appraisals one week before the trial, that the appraisals made no difference in their evaluation of the lease.
"There is no evidence, aside from Shearman's personal opinion, that these appraisers' views are anything but correct. Even so, their significance is not so much their accuracy as it is their suppression. Their disclosure, though not enlightening about the possible political connections, would at least have been relevant to whether or not the State paid too much rent money. As it turned out, failure to disclose them left the reading public no choice except to continue believing the version espoused by the Press in its 19 news articles in 1974 and rekindled in the editorial of July 21, 1977.
"The Press' failure to give any credence to these appraisals or even acknowledge them, is offered as evidence that, once having taken a position, it was unwilling to retreat from that position despite evidence to the contrary and that it continued to pursue its preconceived plan to discredit McHale by convincing its readers that the Sears lease was politically obtained and unfair to the taxpayers.
*564 "The Court at this point wishes to emphasize that neither the news coverage of the Sears lease in 1974, nor the language of its repetition in the editorial of July 21, 1977, nor the failure to disclose the appraisals-singly or collectively, rise to the dimension of an actionable defamation. All of this conduct lies safely, and properly, under the protection of the First Amendment. Nor is the Court saying that the lease was good and the Press wrong in its criticism, or that the appraisals were right and the Press wrong in not disclosing them. Who's right and who's wrong is not before the Court for decision. Even if it was, the evidence before the Court is insufficient to make such a determination. What evidence there is, however, suggests that there were in fact two sides to the controversy and that the Press, in 1974 and in 1977, presented only one side.
"This has inferential significance in McHale's proof of actual malice. These factors are weights to put on the scales when the inquiry is whether there was knowing or reckless falsity, because they suggest that the Press had obdurately made up its mind McHale was a bad man and he ought to be exposed and put down.
"3. The Interview
"McHale resigned as City Attorney in January of 1976. He stayed on as attorney for the Harbor and Terminal District. He was reappointed City Attorney on July 6, 1977. Several days before the meeting of the City Council, upon learning his reappointment was on the council agenda, the Press did two things: (1) it dispatched a reporter to McHale's office to find out about the money he had made as City Attorney, and (2) the entire editorial staff was assigned the preparation of the editorial condemning his reappointment.
"The reporter, Bill Shearman, son of the publisher-defendant, met with McHale by appointment on July 19th or 20th and spent an hour in McHale's office discussing salaries, fees, and time spent in representation of the City. There is a dispute about what happened at this interview. McHale and his secretary testified they went over transcripts of proceedings for previous issuances of paving certificates, sewerage certificates, and certificates of indebtedness. They testified they explained the details of one paving transcript page by page, and how the attorney's fee was calculated at three percent of the total paving contract. Included among the contents explained in detail was McHale's legal opinion, a prerequisite to the sale of the bonds. McHale told young Shearman that the transcripts were there for every fee he had earned as City Attorney, and that the fees could be calculated in accordance with that mathematical formula. He invited Shearman to make the calculations for himself; he did not volunteer to do it for him.
"Shearman made notes of this interview and subsequently turned them over to an editor for the Press. According to the young Shearman, these notes and the interview formed the basis for the news article which was published on the same day as the editorial, July 21. This news article contained the statements,
"As City Attorney, McHale gets a commission on bonds the city sells. He said Tuesday that his `normal commission' was three percent."
"Young Shearman at trial could not remember having had a transcript explained to him. His notes were not available, having been destroyed a few months after suit was filed (July 26, 1977). The above quoted news statements, however, support McHale's and his secretary's versions of the disclosures made at the interview.
"The information supplied the young Shearman at this interview, which took place one or two days before the editorial was written, suggests that the Press had actual knowledge that city bonds had sold on the strength of McHale's opinion.
"4. The Editorial
"The four members of the editorial staff individually drafted a proposed editorial. The date on one of them is July 13, 1977, showing that the editorial's preparation covered a period of at least eight days before *565 its publication. It was not `hot' news.[3] These drafts were reviewed by the defendant Shearman, and it was his determination that the final draft include the statement `No bond buyer would buy a nickel's worth of securities on McHale's opinion'.
"These drafts speak often of bonds and McHale's fees, and show that the drafters were aware he was paid fees for bond issues and legal opinions. In particular, the employment of the following language has significant weight in establishing actual knowledge or reckless disregard for the truth as it relates to the value of McHale's bond opinions:
"McHale has lived well at the public trough for over a decade, reaping thousands of dollars in personal wealth from fees he has been paid for bond issues, legal opinions and other assorted fees.
"We will not be content to rest until we have determined to the penny how much McHale has been paid by the city. It is a matter of public record and the public deserves the full story. The bond fees are totally unnecessary and are a waste of taxpayers' money."
"Accusatory language employed elsewhere in the editorial is said to be further evidence of actual malice, like `reappointment... smells to high heaven', `cram McHale's appointment down the throats of taxpayers', `controversial attorney', `The State is you and me and we don't like to be suckered', and `public funds being siphoned off'.
"Shearman perused all four drafts, added the statement to the final draft that McHale's opinion on securities was not worth anything to bond buyers, and sent it on its way for publication.
"5. The Legal Advertisements
"The issue being whether defendant Shearman should be held inferentially knowledgeable of the fact that bond buyers had brought securities on McHale's opinion before this defamatory utterance, the question arises as to whether the Court can accept his denial of knowledge of numerous legal advertisements that had been run in the paper for years, publicizing in express language the sale of securities on McHale's opinion.
"The evidence reveals that there had been 23 securities offered for sale-certificates of indebtedness, paving certificates and sewerage certificates-totalling in excess of $2½ million, between the years 1971 and 1977, all of which sold on McHale's sole opinion. The transcript of a typical paving project was introduced in evidence. It shows that 18 legal advertisements were run a total of 25 times. Three of these expressly identify McHale as the attorney whose approving legal opinion would underwrite the offerings. Since there were 23 of these projects, it can be calculated that between the years 1971 and 1977 the Press ran 575 such legal advertisements, 69 of which showed that the securities were offered on the approving opinion of McHale. Shearman himself signed the affidavit of publication on at least one of these on August 2, 1976.
"In addition, there were several million dollars worth of bonds in the form of certificates of indebtedness of the Port of Lake Charles and sewerage certificates of the City that were sold on the joint opinion of McHale and Benton, Benton & Benton, before July, 1977. All of these were likewise advertised the required number of times in the Press.
"While Shearman denied knowledge of the contents of these advertisements, saying that no one, including himself, ever read them, it is difficult to believe that this could have gone unnoticed for so long a period of time. They were there for six years before the editorial and during the eight days of its preparation. They related directly to the subject matter of the editorial. In First Amendment cases perhaps the less the publisher knows, the better, but *566 this does not mean that the publisher can disclaim knowledge of evidence ready at hand. While failure to investigate, standing alone, is not proof of reckless disregard, failure to investigate coupled with other evidence, is relevant to that inquiry. The Court has no hesitation to consider this as another element in the probable awareness or reckless disregard category.
"6. Shearman's Personal Knowledge Outside of the Newspaper
"The evidence also reveals that one month before the editorial, Shearman was put in touch with McHale's opinion on the sale of a public security in a connection outside the newspaper. On June 20, 1977, McHale wrote President Boyer of Gulf National Bank of Lake Charles advising that there would be an offering of $350,000 in certificates of indebtedness of the City of Lake Charles to fund a portion of the costs of acquisition of property for the City. As a member of the Board of Directors of this bank, and a member of the Loan Committee of that Board, whose function it was to approve large loans by the bank, Shearman was present at a committee meeting on June 24, 1977 when the bank's bid on the $350,000 of certificates of indebtedness was approved. The official bid form reflected that the securities would be offered over the approving legal opinion of McHale. Shearman never denied in his trial testimony that he was aware of this. The president of the bank testified that it was not customary to furnish the bank committee with that kind of detail.
"7. Other Evidence
"The Court does not give any consideration to the testimony that Shearman had vocalized his intent to `get McHale'.
"There was three such pieces of evidence. One was a statement made to a witness by a reporter of the American Press in 1974. That reporter was not employed by the Press at the time of the trial. Although the testimony was admitted under Code of Civil Procedure Article 1634, the Court does not give it any particular weight. The other similar remarks attributed to Shearman were testified to by Mayor William Boyer and Port Director Sudduth as having been said to them. The Court cannot consider the statements as relevant evidence under Kidder v. Anderson, supra, because they were uttered in 1978, a year after the editorial, in connection with a new series of front page news articles attacking McHale which were then being published.
"For the same reason, the Court does not believe that it is authorized to consider the front page news articles critical of McHale that were published in 1978 as `other defamatory publications', guided by Kidder v. Anderson, supra.

"DEFENSES
"Although the word `defenses' heads up this portion of the opinion, the Court is mindful that it is not defendants' burden under New York Times and other relevant decisions to prove the truth of the statement, nor is it defendants' burden to prove, if the statement was false, that it had a sound factual basis for it and that it was not made knowingly or with reckless disregard, but in good faith. However, there was considerable testimony offered at the trial by defendants regarding what Shearman intended to say, his actual beliefs, and the basis for those beliefs. This testimony, along with the rest of the evidence, must be considered in determining whether McHale has ultimately sustained his burden of proof.
"The first defense is that the statement was true. The second is that if it should be found to be technically false, it was not made with knowledge or reckless disregard. The third is that it was the expression of an opinion, not a statement of fact.
"Shearman's belief in the truthfulness of the statement was based on his experience as a member of the Louisiana Board of Commerce and Industry over a period of 10 years between 1966 and 1976. One of the functions of this Board was to approve general obligation and revenue bond issues across the State that were being considered for industrial inducement purposes. The *567 Board conducted hearings to determine the feasibility of the projects the bonds financed. In this experience, he had noticed that there were three law firms in the State who appeared routinely in connection with bond issues before the Board. Shearman testified that he had observed this to be a general practice, that local counsel would involve special counsel on these bonds, and that the special counsel were always the same three law firms in the State. Benton, Benton & Benton was one. McHale's firm was not. This, according to him, gave him the impression first, that bonds would not sell except on the opinion of one of these bond firms and second, that the word `bonds' meant general obligation or revenue bonds issued for industrial inducement purposes. Since large industrial inducement bonds were the limit of his experience, and McHale, although he had appeared before the Board with Benton on one occasion as co-counsel, had never appeared individually, Shearman declared he thought it was true that McHale's opinion would not stand alone. Finally, his impression was that while certificates of indebtedness, paving certificates and sewerage certificates might be securities, they were not bonds in the limited sense in which he intended the word `bonds', and the word `securities' was intended as a synonym only in the narrow sense that he meant the use of the word `bonds'. He deliberately chose the word `securities' in the sentence that he added to the editorial because this was a synonym for `bonds',[4] and it is good journalistic style to avoid too much repetition of the same word which had already been used three times previously in the editorial.
"He declared that this was his state of mind at the time he penned the offending language and that he believed it to be true and still believes it to be true in this light. Even if the statement was technically incorrect, he urged his good faith belief in its truth at the time he uttered it, as well as a factual basis for that belief, regretting only the failure to make it clear that it was McHale's sole opinion that would not be acceptable.
"The Court does not believe this explanation alters the statement's meaning and intent, or the understanding of readers of what was written.
"The meaning intended by the use of the word `bonds' by the writers on the day that the editorial and related news article were published is clear. No securities of the City of Lake Charles ever went before the Board of Commerce and Industry during the defendant Shearman's 10 year tenure, yet the plain language of the editorial-indeed one of its prominent subjects-was McHale's fees for his legal opinions for city bonds as City Attorney. Since Shearman's only contribution was the one sentence, the use of `bonds' theretofore in the editorial was not his choice of language, but that of the editors whose experience and knowledge of the terminology employed was not based on membership on the Board of Commerce and Industry. Also, the young Shearman who looked at a paving transcript in McHale's office before this editorial was written and visually inspected a McHale legal opinion, and two days later used `bonds' in the news article, knew bonds meant paving certificates. Defendant Shearman, having read the drafts of the editorial he helped to write, must have been aware that when reference was made to McHale's bond fees and opinions for the City, this meant what it said.
"Both `bonds' and `securities' were words appropriate in the context. That bonds means securities in the sense of certificates of indebtedness, paving certificates, and sewerage certificates is consistent with customary usage.
"`Securities' is a synonym for `bonds', and vice versa. Defendant's brief correctly states that `securities' can have many different meanings in different contexts. The same is true of `bonds'. The first of many definitions of the term in Black's Law Dictionary, *568 4th Ed.Rev. (1968) is: `a certificate or evidence of debt'.
"According to the testimony of an expert bond attorney, Fred Benton, paving certificates technically are not bonds. The distinction is a technical one only, however, as he further testified that bond attorneys, including himself, and bondbuyers routinely call such certificates bonds.
"At the trial witnesses repeatedly used the words interchangeably.
"One investment underwriter when asked what he called paving certificates said: `We consider them municipal bonds. To a bondbuyer, it's all the same.'[5]
"Interestingly, the official bid form in use by the City of Lake Charles for its paving certificates, routinely published for years in the paper, uses the word `bonds' four times, `certificates' three times, and `issue' once-all meaning the same thing.
"The Court's conclusion is that McHale's opinion had a value on the bond market, that `securities' includes certificates evidencing public debt, whether referring to regular certificates of indebtedness, or paving or sewerage certificates, and that `bonds' are generally understood in investment circles to include all these. The Court is convinced that the newspaper intended to use the words as synonyms, that readers understood the words as intended, and that the statement is incapable of an innocent construction on the facts. It was false throughout.
"Defendant's final argument is that this was an expression of opinion and not a statement of fact. Letter Carriers v. Austin, 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745, 761 (1974) says `[B]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact.'
"The grammatical test of whether a statement is an opinion or a fact is not simply how the declarant says he meant it. The better test is how readers understand it. The best test is a reflection of what is an opinion and what is a fact. A fact, says Webster's, is a thing that has actually happened, or is true. It can be checked and agreement on whether or not it is true can easily be reached. An opinion, says Webster's, is what one thinks-a judgment-about some person or thing. No one can prove whether a statement of opinion is true or false. It remains an opinion. Comparatively, a statement of the author's taste of food was found in Mashburn v. Collin, 355 So.2d 879 (La.1977), to be an opinion. The statement here involved was a statement of fact. Whether any bond buyer would buy securities on McHale's opinion is a statement which can be proved true or false.

"LIABILITY
"The statement was false.
"The Court believes that the evidence with convincing clarity shows that it was made while the writer was surrounded by a multitude of facts and circumstances compelling the inference of knowledge. The Court concludes that actual knowledge has been proved, or at least a reckless disregard for the truth. Defendants were in possession of knowledge so completely at odds with the published statement that only a reckless disregard of the truth can account for its utterance.
"Freedom of expression of public questions and issues was not served by this base and groundless attack on McHale. `Freedom of the press under the First Amendment does not include absolute license to destroy lives and careers' said Chief Justice Warren in his concurrence in Curtis Publishing Co. v. Butts, supra, 87 S.Ct., at 1999.

"DAMAGES
"The American Press has a circulation of 35,000.
"Unquestionably these defamatory words greatly injured McHale's reputation as an attorney, and impaired his standing in the community.
*569 "He has been severely humiliated and embarrassed, and has suffered considerable mental distress.
"The effect on his mental health was confirmed by several doctors, some of whom saw him professionally and others as friends or relatives. There was evidence of personality changes. His personal activities have been reduced and appearances in public curtailed. The mental reaction has required intermittent medical attention and medication.
"Loss of income was alleged but not proved. There was evidence by a preponderance that the defamatory words contributed to his second resignation as City Attorney in January of 1979. Income from bond fees from that source will decrease, but the dollar value of this loss cannot be fixed with reasonable accuracy. He is still the attorney for the Port of Lake Charles. He has not suffered any loss from that source.
"In Kennedy v. Item Co., 213 La. 347, 34 So.2d 886 (1948), the Louisiana Supreme Court recognized that, due to the difficulty of proving pecuniary damages in a defamation action, the amount of damages is left largely to the discretion of the trier of fact.
"In Gertz v. Robert Welch, Inc., supra, the U. S. Supreme Court stated:
"[A]ctual injury is not limited to out of pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, ... all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." 94 S.Ct., at 3012.
"In arriving at the amount of damages, the Court has been influenced by the decision of the La. Court of Appeal in Kidder v. Anderson, 345 So.2d 922 (La.App.1 Cir. 1977), reversed on other grounds, 354 So.2d 1306 ([La.]1978). That Court, in reducing a jury award from $400,000 to $100,000, stated:
"We are persuaded that an award in such amount would have a `chilling effect' upon the legitimate exercise of the rights of freedom of the press and would lead to undesirable self-censorship, the prevention of which has been the object and purpose of the United States Supreme Court since New York Times Company v. Sullivan." 345 So.2d, at 942.
"After a careful consideration of all the evidence in the case, and mindful of the above quoted Kidder language, the Court concludes that an award of $150,000 is appropriate.
"Punitive damages are permissible under La.Civil Code Art. 2315.1A. I would be inclined to grant punitive damages here but for the above quoted expression from the Court of Appeal Kidder case. This is the only Louisiana appellate court I know of that has expressed an opinion on the `chiling effect' of the damage award itself.[6]
"For the reason that plaintiff is himself an attorney, the Court declines to award attorney fees authorized by Civ.Code Art. 2315.1A."
In his appeal, plaintiff seeks punitive damages and attorney's fees under LSA-C.C. Article 2315.1A, which was in effect at the time of the defamation at issue here, but was repealed by Act 324 of 1980. Article 2315.1A reads as follows:
"In addition to general and special damages, the plaintiff who obtains a judgment because of having been defamed, libeled, or slandered may be awarded punitive damages and reasonable attorneys fees, if it is proved that the defamatory, libelous, or slanderous statement on which the action is based was made with knowledge of its falsity or with reckless disregard of whether it was false or not."

*570 PUNITIVE DAMAGES
The trial court declined to impose punitive damages against defendants, although he had the discretion to do so under Article 2315.1A. Punitive damages have been imposed in some 19th century defamation cases, but following Vincent v. Morgans Louisiana & Texas Railroad and Steamship Company, 48 La.Ann. 933, 74 So. 541 (1912), Louisiana jurisprudence has consistently held that punitive damages are not recoverable at civil law. 37 La.L.Rev. 113. This was legislatively changed in 1976 by the enactment of Civil Code Article 2315.1. Despite the legislative change, no reported Louisiana case has awarded punitive damages in a defamation case.
Civil Code Article 2315.1A incorporates the U. S. Supreme Court test of Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which held that states may permit a recovery of punitive damages in defamation cases when liability is based on a showing of knowledge of falsity or reckless disregard for the truth. Thus, after Gertz, states were free to enact statutes allowing punitive damages where there is a showing of actual malice as defined by New York Times v. Sullivan. Absent actual malice, only compensatory damages may be awarded.
Other jurisdictions have allowed punitive damages in addition to compensatory damages. Most notable is Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1964) in which the Supreme Court approved an award of $400,000 in punitive damages. The courts have generally left the amount of punitive damages to the discretion of the jury. Goldwater v. Ginzberg, 414 F.2d 324 (2d Cir. 1969) and Reynolds v. Pegler, 223 F.2d 429 (2d Cir. 1955). Other jurisdictions have expressed concern over an award of punitive damages despite its sanction in Gertz v. Welch. This concern is illustrated in Sprouse v. Clay Communication, Inc., 211 S.E.2d 684 (W.Va.1975), where the Supreme Court of West Virginia stated:
"It would appear that the penumbra of protection of the First Amendment is such that punitive damages may only be recovered in cases where the award of actual damage is insufficient to dissuade others in like circumstances from committing similar acts in the future. The policy embodied in the First Amendment of encouraging broad dissemination of public information forecloses an award of punitive damages which jeopardize the existence of a newspaper when such damages are unnecessary to protect the public from similar conduct in the future or to make possible the vindication of plaintiff's rights in the absence of demonstrable actual damages. An award of $750,000 would have a chilling effect upon the legitimate exercise of First Amendment rights and would lead to the type of self-censorship which has been the object and purpose of the United States Supreme Court to prevent since New York Times v. Sullivan."

In view of the substantial award for actual damages in the present case, an additional award of punitive damages may well have a chilling effect, as noted by the trial court in its written opinion. We find no manifest error in this conclusion.

ATTORNEY'S FEES
LSA-C.C. Article 2315.1A provides that reasonable attorney's fees "may be awarded" where the defamatory statement was made with knowledge of its falsity or with reckless disregard of whether it was false or not. The article makes the award of attorney's fees discretionary with the trial court. Thus, in the present case the trial judge had the discretion to award reasonable attorney's fees or not.
In his written reasons quoted above, the trial judge stated that he declined to award attorney's fees for the reason that the plaintiff is himself is an attorney. We do not agree that this is a valid reason to deny attorney's fees under statutes permitting such awards.
We find two Louisiana cases holding that an attorney who represents himself cannot recover attorney's fees. See Westenberger *571 v. Bernard, 160 So.2d 312 (La.App. 4th Cir. 1964), which cites Ealer v. McAllister & Company, 19 La.Ann. 21. Plaintiff cites two Texas cases which allowed an attorney-plaintiff, who did not represent himself, to recover attorney's fees upon successful completion of his suit. Youngblood v. Wilson & Cureton, 321 S.W.2d 887 (Tex.Civ. App.1959) and Urschel v. Crow, 314 S.W.2d 423 (Tex.Civ.App.1958). 20 Am.Jur.2d Sec. 77 indicates cases from other jurisdictions are divided on the issue of whether an attorney-plaintiff who represents himself can claim attorney's fees. However, we find no authority in Louisiana or any other jurisdiction for a rule that an attorney who employs another attorney to represent him cannot claim attorney's fees if he is successful in his suit, and if such fees are authorized by statute.
In the present case, plaintiff contracted with three other attorneys to represent him. He agreed to pay one of these attorneys a contingent fee of 30% of the award of damages. This agreement is a factor to be considered but is not binding on the courts. A reading of the record shows the attorneys employed are highly skilled and experienced. The amount of pretrial work is extensive. The trial took four days. The record on appeal includes 17 volumes containing 2,586 pages. The attorneys were successful in obtaining a judgment for compensatory damages in the sum of $150,000. We conclude plaintiff is entitled to an award of $25,000 for attorneys' fees.
For the reasons assigned, the judgment appealed is amended to increase the award by the sum of $25,000, representing reasonable attorneys' fees under LSA-C.C. Article 2315.1A. Otherwise, the judgment is affirmed. All costs of this appeal are assessed against the defendant-appellant.
AFFIRMED, AS AMENDED.
NOTES
[1] A third defendant, Thomas B. Shearman, was dismissed by the Court at the conclusion of plaintiff's evidence, as having no tort relationship to the case.
[2] One of these appraisers, Leroy Cobb, writing on November 20, 1974, said `if inflation continues at its present rate, this will be a very poor lease for the lessors at the end of the fifth year.' (McHale Exhibit No. 11).
[3] Curtis Publishing Company v. Butts, 388 U.S. 130, 157, 875 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
[4] Roget's Thesaurus was introduced to establish the synonymity of the words. Shearman did not testify he consulted this authority while writing, but he did say he then thought the words were the same.
[5] Lee Murphy deposition, p. 27 (McHale Exhibit No. 7).
[6] At least two cases outside this state show a concern for First Amendment implications of libel awards: Sprouse v. Clay Communication, Inc., 211 S.E.2d 674, at 692 (W.Va.1975), cert. denied, [423 U.S. 882] 96 S.Ct. 145 [46 L.Ed.2d 107] (1975), and Airlie Foundation Inc. v. Evening Star Newspaper Co., 337 F.Supp. 421 (D.D.C.1972).